[No. S005092. Jan. 16, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
HORACE EDWARDS KELLY, Defendant and Appellant.

508

## COUNSEL

Fern M. Laethem, State Public Defender, under appointment by the Supreme Court, Therene Powell, Richard Avila and Sandra L. Goldsmith, Deputy State Public Defenders, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Keith I. Motley and Rudolf Corona, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

ARABIAN, J.—This is an automatic appeal from a judgment of death. Defendant Horace Edwards Kelly was found guilty of two counts of first degree murder (Pen. Code, § 187),[1] one count of rape (§ 261, former subd. (2)), one count of attempted rape (§§ 664/261, former subd. (2)), and one count of robbery (§ 211). The jury found that defendant used a firearm in the commission of each count (§§ 12022.3, subd. (a), 12022.5), and found true four special circumstance allegations: murder during the commission or attempted commission of rape as to both murders (§ 190.2, subd. (a)(17)(iii)), murder during the commission or attempted commission of robbery as to one murder (§ 190.2, subd. (a)(17)(i)), and multiple murder (§ 190.2, subd. (a)(3)). The jury also found defendant was sane at the time of the crimes, and then imposed the death penalty.[2]

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

[2]In *People* v. *Kelly* (1990) 51 Cal.3d 931 [275 Cal.Rptr. 160, 800 P.2d 516] (*Kelly I*), we affirmed another judgment of death imposed against defendant in a separate case. Evidence of the crimes in this case was introduced as aggravating evidence in *Kelly I*. Evidence of the murder in *Kelly I* was introduced as aggravating evidence in this case.

## FACTS

The jury found that defendant murdered and attempted to rape Sonia Reed on November 16, 1984, and murdered, raped, and robbed Ursula Houser the next day. Both murders were committed in San Bernardino.

### I. *Guilt Phase Evidence*

#### A. *Prosecution Evidence*

Sonia Reed spent part of the early morning hours of November 16, 1984, with Gary Venable. Venable last saw her around 4 to 4:30 a.m. when he dropped her off at the corner of Waterman and Orange Streets, near an area called the Waterman Gardens. Around 4 a.m. that morning, Linda Millette, who lived in the area, heard a scream. A little later, around 4:20 to 4:30, she heard a gunshot followed, about 30 seconds later, by a second gunshot. Around the same time another area resident, Irene Gamboa, heard a "bang" that sounded like the "backfire of a car," and a voice saying, "Oh, God," or "Oh, my God." Gamboa was not certain whether she heard the voice or the bang first. She thought the voice sounded like a male. Gamboa heard a second bang about four to five minutes after the first.

Later that morning, Reed's body, nude from the waist down, was discovered behind a headstone at a memorial business at Tenth and Waterman Streets. Various items of female clothing were strewn about the body. The victim's bra was unfastened.

An autopsy revealed Reed had been shot twice. The first shot was through the back, severing the spinal cord and penetrating the heart. The bullet was recovered inside the victim's jacket, indicating it hit a hard object such as concrete which stopped its flight. This wound would have caused immediate paralysis from the waist down. The second shot, fired about one to three minutes after the first, went into the back of the head and out through the right lower eyelid. It would have caused instant death. The nature of the wound indicated the head had been bent backwards at the time of the shot. Both wounds were "contact wounds"; the "muzzle of the gun [was] held tightly against the body." There was no vaginal trauma. A small amount of semen was found that did not come from defendant.

Ursula Houser was with Gerrard Timper and others the morning after the Reed murder. She was wearing a leopard skin design dress. Timper left Hauser around 4 to 5 a.m. in an alley behind a bowling alley near Highland Avenue and D Street. Houser's body, also nude from the waist down, was

discovered in the alley later that morning. Some distance from the body was a pool of blood, with drag marks leading from the blood to the body. Near the blood were some makeup articles and women's shoes. Plastic bags, a purse, pantyhose and panties were close to the body. It appeared that Houser had been shot by the pool of blood, then dragged face down by the feet to where the body was found.

An autopsy revealed that Houser died of a single gunshot wound that entered the back of the head and traveled through the brain. As with Reed, the muzzle of the gun had been pressed against the head. Brain death would have occurred almost instantly, although the heart might have continued to pump for a short time. The body was thus essentially dead before it was dragged away. A black hair not from the body was found among the victim's pubic hair, and another on her back under the dress. There was no evidence of vaginal trauma. A very small amount of sperm was found. Sexual contact connected to physical evidence probably occurred about 24 hours before death, although there could have been more recent sexual contact that left no trace.

Defendant lived in the Waterman Gardens area, near the scene of the Reed murder. Records showed that he purchased a Dan Wesson .357 magnum handgun on September 11, 1984. Between 4 and 5 a.m. on both November 16 and 17, 1984, that is, around the time of the murders, defendant drove his stepson, Thomas Fields, Jr., to work in defendant's van. On both occasions, defendant dropped Fields off on East Highland Avenue and drove away alone.

Defendant was arrested while driving his van on November 22, 1984. Eight rounds of unexpended .357-caliber ammunition were in his left trouser pocket. His .357 magnum was found hidden behind the left rear taillight of the van. Forensic tests conclusively established that the handgun fired the bullets into Reed's back and Houser's head. The bullet fired through Reed's head was never recovered.

The police searched defendant's home pursuant to a search warrant. They seized a ring that defendant's wife pointed out in their bedroom. The police obtained a second ring which defendant had sold to his mother-in-law shortly after the Houser murder. John Brown, Houser's boyfriend, testified that the two rings belonged to her. She routinely wore them when "she went out," although she would take them off when she was doing chores at home. When Brown last saw Houser the evening before she was murdered, she was not wearing the rings. She was dressed in blue jeans, and had been working in the garden.

Defendant was interviewed after his arrest. An edited tape of the interview was played to the jury. Defendant denied the murders at first, but then confessed to them. He stated repeatedly that he had had vaginal sex with both victims before he shot them. He said he was not in his "right state of mind," and was having "headaches." He admitted obtaining the two rings, and giving one to his wife and selling the other to his mother-in-law. He said, however, that Houser was not wearing the rings; he found them in a trash can.

### B. *Defense Evidence*

Christine Kelly testified she married defendant, who is 18 years younger than she, in April 1984. Defendant obtained a job as a security guard and applied for another job with the sheriff's department. He told Christine he had bought the gun to make more money in his work and to protect her. Defendant complained of "headaches all the time." She never knew him to be violent.

### II. *Sanity Phase Evidence*

The defense presented two expert witnesses, Dr. Jerry Hoyle, a clinical psychologist, and Dr. Richard Rappaport, a psychiatrist. Dr. Hoyle had examined defendant regarding his claims of extreme facial pain, which was apparently related to a dental problem. After examining defendant, reviewing records, and administering a standard MMPI (Minnesota Multiphasic Personality Inventory), Dr. Hoyle opined that defendant had a "psychotic-like disturbance." He had "impaired intellectual ability of some kind," which caused him to "misinterpret[] and distort[] incoming information . . . ." He suffered from an "attention deficit disorder" and a "schizotypal personality disorder." He was not psychotic. He had "dull normal" intelligence, and was brain damaged. Dr. Hoyle also opined, however, that defendant understood the difference between right and wrong and understood the nature and quality of his acts.

Dr. Rappaport examined defendant and reviewed various reports and tests. Defendant was born seven weeks prematurely. He told Dr. Rappaport about his difficult childhood, and said that his father had abused him. Dr. Rappaport concluded that defendant "is not a violent person." Some "kind of unconsciousness or unconscious impulse . . . led him to violence." He was "brain damaged" and "impaired on a mental basis," but not necessarily psychotic. He had a dysfunction causing him to react spontaneously, in "almost a knee jerk reaction." His intellectual functioning was "borderline."

Dr. Rappaport also believed that defendant "has at times difficulty in knowing the nature and quality of his act[s] and at times [has] questions

about whether or not things are right or wrong." Generally, however, defendant "does know right from wrong." Defendant knew what he was doing at the time of the murders, and knew the difference between right and wrong. Therefore, Dr. Rappaport believed that at the time of the murders, defendant was sane under the California definition of sanity.

The prosecution presented one witness, Dr. David Hinshaw, a radiologist who reviewed a CAT scan taken of defendant. The only "flaw" Dr. Hinshaw found was a slight dilation of the "temporal horns that pass through a portion of the fluid filled spaces of the brain" and a "few of the sulci spaces, that is the spaces between the folding of the surface of the brain." It was a "minor change," was "very common," and did not necessarily suggest mental illness.

## III. *Penalty Phase Evidence*

### A. *Prosecution Evidence*

The prosecution presented evidence of criminal activity involving defendant's use of force or violence in Riverside County a few days after the murders, i.e., the crimes reviewed in *Kelly I, supra*, 51 Cal.3d at pages 940-942. Briefly stated, on November 22, 1984, defendant assaulted 13-year-old Shannon P. and her 11-year-old cousin, Danny O., as they were walking down a path in Riverside. He grabbed Shannon, then fatally shot Danny twice when the boy attempted to come to her aid. The second shot—between the eyes at close range—came as Danny was pleading for his life. Shannon escaped. Defendant was convicted of first degree murder with special circumstances in the case.

### B. *Defense Evidence*

Defendant called numerous witnesses in mitigation. His mother and aunt testified about defendant's difficult childhood. He was born prematurely and was abused by his father until the father's death when defendant was nine years old. Thereafter, defendant worked at various odd jobs to help support the family. He was a loner and educationally retarded, and often complained of headaches.

Two school psychologists, a school social worker, a learning disability analyst, and two teachers presented testimony concerning defendant's performance in school in New Jersey. He had learning disabilities and borderline intelligence, and functioned at a fourth or fifth grade level in the ninth grade. He was often harassed and rejected by fellow students. He was a loner

and frustrated in school. Yet he was not a discipline problem. One teacher even described him as a "model student."

Finally, defendant presented the testimony of Dr. Craig Rath, a clinical psychologist who examined defendant and reviewed the various reports and other documentation regarding him. Dr. Rath concluded that defendant is of borderline intelligence but is not retarded. He is best described as having a "schizotypal personality disorder in conjunction with a moderate degree of brain damage." He is not antisocial. On the surface he would act compliant and cooperative, but was angry on the inside. His "terrible headaches" contributed to his problems. "Everything built up and then the dam burst."

## DISCUSSION

### I. *Guilt Phase Issues*

#### A. *Contentions Relating to Jury Selection*

##### 1. *Sequestered Questioning*

The court allowed the parties to question the prospective jurors individually regarding their attitudes towards the death penalty. (See *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301].) After a number of jurors had been so questioned, defense counsel asked permission also to ask the individual jurors about their attitudes regarding race. (Defendant is Black; one of the murder victims was White.) The trial court read the decision in *Turner* v. *Murray* (1986) 476 U.S. 28 [90 L.Ed.2d 27, 106 S.Ct. 1683], and then allowed such questions during the remainder of the individual voir dire. It denied defense counsel's request to recall each juror who had already been individually questioned. Instead, the court allowed defense counsel to ask pertinent questions during the general portion of the voir dire, and to question any prospective juror in private who so requested.

■ Relying on *Turner* v. *Murray, supra,* 476 U.S. 28, and *Hovey* v. *Superior Court, supra,* 28 Cal.3d 1, defendant contends the court erred in not allowing him to recall all previously questioned jurors in order to question them again in private. Neither decision supports defendant.

In *Hovey* v. *Superior Court, supra,* 28 Cal.3d 1, we were concerned that repeated questioning of prospective jurors in open court regarding their attitudes on the death penalty would tend to unduly "focus on the penalty phase of the proceeding, possibly causing the jurors to anticipate guilt."

(*People* v. *Thompson* (1990) 50 Cal.3d 134, 156 [266 Cal.Rptr. 309, 785 P.2d 857].) Therefore, to "minimize the potentially prejudicial effects of exposing jurors to excessive pretrial discussion and questioning about the penalty phase" (*People* v. *Douglas* (1990) 50 Cal.3d 468, 522 [268 Cal.Rptr. 126, 788 P.2d 640]), we held that questioning of prospective jurors regarding the death penalty "should be done individually and in sequestration." (*Hovey, supra,* 28 Cal.3d at p. 80.) As we noted, "Such a reduction in the pretrial emphasis on penalty should minimize the tendency of a death-qualified jury to presume guilt and expect conviction." (*Ibid.*)

This sequestration rule was formulated in the unique context of death-qualifying the jury. We made clear in *Hovey* v. *Superior Court, supra,* 28 Cal.3d 1, that the rule does not extend beyond this narrow confine: "The rule of sequestration announced today does *not* require a sequestered voir dire when venirepersons in capital cases are interrogated about those topics routinely discussed in selecting a jury for any criminal case. For example, the following questions may be asked without sequestering the prospective jurors: Do you know the judge, the lawyers, the defendant, the witnesses, or any of the prospective jurors in this case? Have you served on a jury before, and if so, in what kind of case? Have you or your close friends or relatives ever been employed by a law enforcement agency? Or been the victim of a crime, or a witness to a crime, or testified in a criminal case? When pertinent, questions may also be asked concerning the exposure of prospective jurors to pretrial publicity, and their attitude towards proposed defenses (e.g., insanity, diminished capacity, self-defense, or alibi), potentially controversial circumstances of the case (e.g., *the race of the participants,* the use of alcohol or drugs, or the presence of sexual activity), or important rules of law bearing on the trial (e.g., the defendant's right not to testify, presumption of innocence, truth beyond a reasonable doubt, or jury unanimity).

"However, if any of these questions in a specific case are relevant to the death-qualification of the panel or may tend to identify those prospective jurors whose views on capital punishment render them ineligible, then those particular questions should be answered individually and in sequestration. *It is the duty of trial counsel to alert the court in advance of voir dire as to which of those general topics are likely to call forth answers bearing on the death-qualification of the jury.*" (*Hovey* v. *Superior Court, supra,* 28 Cal.3d at p. 81, fn. 137, italics added.)

In *Turner* v. *Murray, supra,* 476 U.S. at pages 36-37 [90 L.Ed.2d at pages 36-37], the high court held that a "capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." The court also limited the scope

of the holding: "The rule we propose is minimally intrusive; as in other cases involving 'special circumstances,' the trial judge retains discretion as to the form and number of questions on the subject, *including the decision whether to question the venire individually or collectively.* [Citation.] Also, a defendant cannot complain of a judge's failure to question the venire on racial prejudice unless the defendant has specifically requested such an inquiry." (*Id.* at p. 37 [90 L.Ed.2d at p. 37], italics added.)

In combination, *Hovey* v. *Superior Court, supra,* 28 Cal.3d 1, and *Turner* v. *Murray, supra,* 476 U.S. 28, thus hold only that the death-qualifying portion of voir dire must be held with individually sequestered jurors, and the defense must be allowed to question the jurors in some fashion on the issue of racial bias.[3] Neither rule was violated in this case. Defendant *was* allowed to question the prospective jurors about race. *Hovey* and *Turner* do not require the questioning be of individually sequestered jurors; they certainly do not require the recall of those jurors questioned before the defense brought the matter to the court's attention. The court did not abuse its discretion. (See also *People* v. *Clark* (1990) 50 Cal.3d 583, 596-597 [268 Cal.Rptr. 399, 789 P.2d 127] [no abuse of discretion in limiting questioning during the sequestered voir dire].)

### 2. Challenges for Cause

■ Defendant contends the trial court erroneously overruled his challenges for cause to four prospective jurors each of whom, he claims, made it clear that his views in favor of the death penalty "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' . . ." (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844]; see *Kelly I, supra,* 51 Cal.3d at pp. 959-960.) The contention lacks merit.

Our discussion of a similar contention in *Kelly I, supra,* 51 Cal.3d 931, applies to this case. ■ "To complain on appeal that a prospective juror should have been excused for cause, the defendant must have exercised and exhausted his peremptory challenges." (*Id.* at p. 960.) ■ Defendant exercised only six of his peremptory challenges in selecting the original twelve jurors and eight alternates. Of the four prospective jurors here in question, two eventually *were* excused for cause, although not when initially challenged; the other two were excused peremptorily by defendant. "Thus,

---

[3]We do not suggest the trial court may not allow questioning of the sequestered jurors that goes beyond death-qualification, but only that it is not *required* to do so. The matter lies within the discretion of the court. (See, e.g., *Odle* v. *Superior Court* (1982) 32 Cal.3d 932, 936, fn. 2 [187 Cal.Rptr. 455, 654 P.2d 225] [noting that some courts in capital cases have been conducting voir dire in sequestration regarding publicity].)

even assuming arguendo that the trial court erroneously denied defendant's challenges for cause, the error was harmless . . . ." (*Ibid.*)

Defendant contends the court consistently applied the wrong standard in ruling on challenges for cause, thus discouraging additional challenges. Even assuming the contention is relevant (cf. *Kelly I, supra,* 51 Cal.3d at pp. 960-961, fn. 4), it finds no support in the record.

Furthermore, our review of the record discloses that although the two prospective jurors who were not ultimately excused for cause gave conflicting answers to questions concerning their views on capital punishment, both of them ultimately confirmed that they would consider life without possibility of parole as an alternative disposition. ■ "Where conflicting or equivocal responses are elicited on voir dire, the trial court's determination of impartiality is generally binding on this court." (*Kelly I, supra,* 51 Cal.3d at p. 960.) We conclude, therefore, that the trial court's failure to excuse the prospective jurors was not error.

B. *Admission of Confession*

■ Defendant contends his confession was erroneously admitted on several grounds.[4] He did not object to its admission at trial; therefore, he may not raise the issue on appeal. (Evid. Code, § 353, subd. (a); *People v. Benson* (1990) 52 Cal.3d 754, 782, fn. 5 [276 Cal.Rptr. 827, 802 P.2d 330]; *People v. Jackson* (1989) 49 Cal.3d 1170, 1188 [264 Cal.Rptr. 852, 783 P.2d 211]; *People v. Milner* (1988) 45 Cal.3d 227, 236-237 [246 Cal.Rptr. 713, 753 P.2d 669].)[5]

■ Defendant also contends his attorney was ineffective by not objecting. ■ To show ineffective assistance of counsel, defendant has

---

[4]Both parties refer to the statement as a confession rather than an admission, which seems correct. The distinction is not crucial to our resolution of this issue. (See *Kelly I, supra,* 51 Cal.3d at p. 945, fn. 2.)

[5]Citing *In re Cameron* (1968) 68 Cal.2d 487, 503 [67 Cal.Rptr. 529, 439 P.2d 633], defendant argues that there need not be an objection when the record shows that the confession was involuntary as a matter of law. We need not decide whether that rule has survived in light of subsequent authority and the development of the law of ineffective assistance of counsel, for our review of the record convinces us that the confession was not involuntary as a matter of law. In this regard, we grant defendant's motion to judicially notice the relevant portions of the record in *Kelly I, supra,* 51 Cal.3d 931.

In light of our disposition of this issue, we need not decide whether the rule of *Arizona v. Fulminante* (1991) 499 U.S. __ [113 L.Ed.2d 302, 111 S.Ct. 1246]—that the erroneous admission of a confession may be deemed harmless beyond a reasonable doubt—applies under California law. (See *People v. Boyer* (1989) 48 Cal.3d 247, 279-280, fn. 23 [256 Cal.Rptr. 96, 768 P.2d 610]; *People v. Asay* (1990) 224 Cal.App.3d 608 [273 Cal.Rptr. 737]; *People v. Porter* (1990) 221 Cal.App.3d 1213 [270 Cal.Rptr. 773].)

the burden of proving that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687-688, 693-694 [80 L.Ed.2d 674, 693-694, 697-698, 104 S.Ct. 2052]; *People* v. *Frierson* (1991) 53 Cal.3d 730, 747 [280 Cal.Rptr. 440, 808 P.2d 1197].)

■ Generally, failure to object is a matter of trial tactics as to which we will not exercise judicial hindsight. (*People* v. *Lanphear* (1980) 26 Cal.3d 814, 828 [163 Cal.Rptr. 601, 608 P.2d 689].) ■ "When a defendant makes an ineffectiveness claim on appeal, the appellate court must look to see if the record contains any explanation for the challenged aspects of representation. If the record sheds no light on why counsel acted or failed to act in the manner challenged, 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation' (*People* v. *Pope* [(1979)] 23 Cal.3d [412,] 426), the contention must be rejected." (*People* v. *Jackson, supra,* 49 Cal.3d at p. 1188.) A reviewing court will not second-guess trial counsel's reasonable tactical decisions. (*People* v. *Milner, supra,* 45 Cal.3d at p. 238.)

■ The record in this case strongly suggests a reasonable explanation for the failure to object. (See *People* v. *Lanphear, supra,* 26 Cal.3d at pp. 828-829.) Although the confession was harmful in some respects, competent counsel could reasonably believe it helped the defense in other respects.

Defense counsel was representing a client who had already received one death sentence. Disregarding the confession, the evidence of identity as to the two murders was virtually unassailable—the similarity of the crimes suggested one person committed both; ballistics evidence showed conclusively that the gun defendant bought and hid in the back of his van killed both victims; defendant was alone in the area early in the morning of *both* murders; and shortly after the killings, defendant was in possession of two rings belonging to one of the victims.

There were two murders. If either was found to be in the first degree, a multiple-murder special circumstance was virtually unavoidable no matter what the jury found regarding the rape and robbery charges and the related special circumstance allegations. (See *People* v. *Cooper* (1991) 53 Cal.3d 771, 828 [281 Cal.Rptr. 90, 809 P.2d 865].) The evidence of premeditation supporting a first degree murder verdict was compelling—one bullet through the back of the first victim followed one to three minutes later by a second

bullet through the head, and a similar bullet through the head of the second victim the next day. For these reasons, counsel could reasonably believe an eventual penalty phase was highly likely, if not a foregone conclusion, whether or not the confession was admitted at the guilt phase.

Thus, counsel could reasonably believe the major thrust of the defense as a whole was to avoid the death penalty, and that all three phases, guilt, sanity, and penalty, should be tried with that goal in mind. Indeed, outside the presence of the jury, defense counsel candidly told the court he considered the sanity phase a "precursor" to the penalty phase.

Under these circumstances, counsel had to make the tactical decision whether on balance admission of the confession would help or hurt the defense. Defendant's statements regarding the rings supported the defense theory that he took them *after* the murder, which would be a defense to the robbery charge and the related robbery-murder special circumstance. (See pt. I. E. of Discussion, *post*.) In addition, the confession was liberally sprinkled with statements that might be considered mitigating or which might evoke sympathy.[6] In effect, the tape was an opportunity for the jury to hear defendant testify without being subjected to cross-examination. (Cf. *People v. Edwards* (1991) 54 Cal.3d 787, 818 [1 Cal.Rptr.2d 696, 819 P.2d 436] [*defendant* attempted to introduce his postarrest statement when the prosecution did not use it].)

Defense counsel repeatedly used the taped confession in argument to the jury during the guilt and penalty phases. For example, he argued, "Horace, as you probably surmised from the tapes, is incapable of" premeditation; that defendant's statements disproved the robbery charge; and that defendant "showed remorse during the interrogation that the prosecution played." Dr. Rappaport relied on the confession as a basis for his sanity phase opinion.

---

[6]E.g., repeated references to suffering from "headaches" or a "swelling"; and the following statements: "I ain't in my right mind"; "I just couldn't control myself"; "I would hear things and do things beyond my, my powers"; "I been thinking crazy"; "This wouldn't have happened . . . if I'd have been myself"; "I wanted to have . . . revenge with my father" who had been "shot and killed"; the father "beat me"; "I pray to God would have mercy for what I done"; "I don't know who to seek for help"; "I had been dreaming, and I would break out in a cold sweat, or I'd be fighting in my sleep"; "I wanted to be a policeman"; "I don't even know what I'm doing"; "I was always bein' picked on. Always with the wrong crowd"; "I ask God to show me what I did wrong"; "I even tried to kill myself"; "I read . . . the Bible"; "He said I had a demon in me. Somethin' that's holding me down"; "I need psychiatric help"; "it wasn't me that was doing these killings . . . as far as my uh mental problem"; at the time of the first murder he was "going down Waterman and that's when it all started. I had the pains. Extreme pains and cryin' "; the gun "took control of me"; and "I asked God forgiveness, and He showed me the way to repent." Defendant repeatedly broke down and cried during the interrogation.

Defendant argues that portions of the confession helped the prosecution. This is undoubtedly correct—defendant admitted he was the killer, and he insisted that he had sex with the victims before he killed them. As noted, in other regards, the confession helped the defense. This does not mean counsel's decision was incompetent, only that it was difficult. Competent counsel often are confronted with tactical choices that have cons as well as pros; a fortiori, they are permitted, indeed required, to make them.

Defendant argues that since he did not present a diminished capacity defense, his mental state was irrelevant to the guilt phase, and thus counsel should have admitted the tape at a later phase if at all. However, counsel could reasonably believe the guilt phase was a good time to begin the campaign designed to ultimately prevail at the penalty phase. In addition, a successful suppression motion at the guilt phase would have prevented admission of the confession at any phase. Even if somehow counsel could object at the guilt phase, and then withdraw the objection and hope the prosecution would offer the confession later (or try to offer it himself as in *Edwards, supra,* 54 Cal.3d at p. 818), it still might be best to let the jury hear the tape early in the trial as part of the *prosecution* evidence. Counsel's credibility would suffer if he argued a fact at the guilt phase that was contrary to what the jury later heard from his client's own mouth. The record reflects counsel was understandably concerned with preserving his credibility with the jury from one phase to the next.

In *People* v. *Lanphear, supra,* 26 Cal.3d at pages 826-831, the defendant claimed his attorney was ineffective for not objecting to evidence at the guilt phase of crimes other than the charged offense. In the habeas corpus proceeding related to the appeal, defense counsel stated in a declaration that he had not objected because he did not believe the evidence was particularly prejudicial to defendant's alibi defense, and counsel believed "that the evidence was admissible, and if not admitted at the guilt phase, it would be admitted at the penalty phase." (*Id.* at p. 830.) We rejected the claim of ineffectiveness. "Defense counsel was caught in a cruel dilemma: If the prior murders were introduced for the first time when the jury was considering penalty alone, the impact would be such as to make the penalty of death a foregone conclusion. . . . We cannot say that the trial counsel's actions were not the product of informed tactical choice within the range of reasonable competence." (*Id.* at p. 831.)

*Lanphear* teaches that counsel may reasonably treat the entire trial as a whole, and consider what effect a tactical decision at one phase will have on a later phase. Although there is no declaration of counsel in this appellate case, counsel faced a similar tactical situation. Counsel had to make the

difficult decision whether on balance the defense would benefit from the jury hearing the tape of defendant's confession as part of the prosecution case-in-chief at the guilt phase. This is precisely the type of tactical decision defense counsel must be allowed to make without fear of appellate second-guessing " 'in the harsh light of hindsight.' " (*People* v. *Lanphear, supra,* 26 Cal.3d at p. 828, quoting *People* v. *Thomas* (1974) 43 Cal.App.3d 862, 869 [118 Cal.Rptr. 226].)

### C. *Cross-examination of the Pathologist*

During the cross-examination of Dr. Irving Root, the pathologist who performed both autopsies, the defense sought to elicit testimony regarding the amount of alcohol or cocaine in the victims' systems. The prosecution objected on relevancy grounds, and a hearing was held outside the presence of the jury. Defense counsel argued that the evidence "goes to the character of the victim," and that it was relevant to a possible kidnapping claim. The court ruled that in the absence of prosecution evidence suggesting kidnapping, evidence on that point would not be relevant. Dr. Root stated that the alcohol or cocaine content did not contribute to the cause of death of either victim. The court sustained the relevancy objection.

Defendant contends the court erred. However, only relevant evidence is admissible, that is, evidence "including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210; *People* v. *Green* (1980) 27 Cal.3d 1, 19 [164 Cal.Rptr. 1, 609 P.2d 468].) The court is vested with wide discretion in determining relevance under this standard. (*People* v. *Green, supra,* at p. 19.)

We perceive no abuse of discretion. The court is not required to admit evidence that merely makes the victim of a crime look bad. Consumption of cocaine or alcohol did not contribute to the cause of death, the victims' character was not at issue, and there was no claim of kidnapping (even assuming alcohol or cocaine consumption would somehow be relevant to a kidnapping charge). For the first time on appeal, defendant argues such consumption was relevant to the defense of consent or reasonable belief in consent as to the rape charges. Such a defense was neither relied upon at trial nor suggested as a basis for admission of the evidence. Furthermore, evidence of substance abuse, without more, would be meaningless to a jury's consideration of the victims' conduct. The court properly disallowed the evidence.

### D. *Contentions Related to the Rape Charges*

One of the defense theories at trial was that defendant first acquired the intent to have intercourse with the victims after they were dead. Over defense objection, the court gave the following nonstandard instruction to the jury in addition to the standard instructions: "*It is legally possible to rape a dead body.* Where a defendant attempts to coerce his victim into intercourse with him, fails to accomplish the purpose while she is alive and kills her to satisfy his desires with her corpse, the killing falls within the felony murder rule." (Italics added.)

Defendant contends that the emphasized language was erroneous, that the error was prejudicial as to the rape and attempted rape charges, that it invalidated the rape-felony-murder theory so as to require reversal of the first degree murder charges, and that the rape special-circumstance findings must be reversed. We agree that the emphasized sentence was error requiring reduction of the rape conviction to attempted rape. However, the error does not affect the attempted rape conviction, the related firearm-use enhancements, the validity of the rape-felony-murder theory of first degree murder, or the rape special circumstances.

 Rape requires a live victim. "Rape must be accomplished with a person, not a dead body. It must be accomplished against a person's will. A dead body cannot consent to or protest a rape, nor can it be in fear of immediate and unlawful bodily injury [as required by section 261, former subdivision (2)]. Penal Code section 263 provides, '[t]he essential guilt of rape consists in the outrage to the person and feelings of the victim of the rape . . . .' A dead body has no feelings of outrage." (*People* v. *Sellers* (1988) 203 Cal.App.3d 1042, 1050 [250 Cal.Rptr. 345], fn. omitted; see also *People* v. *Stanworth* (1974) 11 Cal.3d 588, 604-605, fn. 15 [114 Cal.Rptr. 250, 522 P.2d 1058]; *People* v. *Morales* (1989) 48 Cal.3d 527, 552 [257 Cal.Rptr. 64, 770 P.2d 244]; *People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1176 [270 Cal.Rptr. 286, 791 P.2d 965] [applying a similar rule to the crime of sodomy].)

This does not, however, mean that intercourse after death negates the felony-murder rule, the rape special circumstance or the rape weapon enhancements. Felony murder includes a killing "committed in the perpetration of, *or attempt to perpetrate,* . . . rape . . . ." (§ 189, italics added.) As relevant here, the rape special circumstance applies to a murder "committed while the defendant was engaged in or was an accomplice in the commission of, [or] *attempted commission of*" rape. (§ 190.2, subd. (a)(17)(iii)), italics added.) The firearm-use enhancement applies to the "attempted commission of a felony." (§ 12022.5, subd. (a).)

In *People* v. *Quicke* (1964) 61 Cal.2d 155 [37 Cal.Rptr. 617, 390 P.2d 393], the defendant attempted to rape his victim, but strangled her when he met resistance. He drove the body to another location where he had intercourse with it. We held these facts supported a finding that the killing "was done in the perpetration of rape." (*Id.* at p. 158.)

Similarly, in *People* v. *Goodridge* (1969) 70 Cal.2d 824 [76 Cal.Rptr. 421, 452 P.2d 637], the defendant beat and stabbed the victim while attempting to rape her. After the stabbing, either immediately before or after death, he had intercourse with the body. We rejected a claim that since it is impossible to rape a dead body, the trial court should not have instructed on the felony-murder rule. In language which formed the second sentence of the special instruction now challenged, we stated, "Where a defendant attempts to coerce his victim into intercourse with him, fails to accomplish his purpose while she is alive, and kills her to satisfy his desires with her corpse, the killing is first degree murder." (*Id.* at p. 838; see also *People* v. *Booker* (1977) 69 Cal.App.3d 654, 666 [138 Cal.Rptr. 347] ["When a conviction of first degree murder is based on the theory of killing during an attempted rape, it is irrelevant whether the victim was already dead at the time of penetration."].)

Since the rape special circumstance applies to a killing while engaged in the commission or attempted commission of rape (see *People* v. *Guzman* (1988) 45 Cal.3d 915, 951 [248 Cal.Rptr. 467, 755 P.2d 917]), it also does not matter whether actual penetration did not occur until after death for purposes of the special circumstance. In sum, a person who attempts to rape a live victim, kills the victim in the attempt, then has intercourse with the body, has committed only attempted rape, not actual rape, but is guilty of felony murder and is subject to the rape special circumstance.

■ We now examine the instructions to determine whether this law was correctly conveyed to the jury. Once we have ascertained the relevant law, we determine the meaning of the instructions in this regard. Here the question is whether there is a "reasonable likelihood" that the jury understood the charge as the defendant asserts. (*Estelle* v. *McGuire* (1991) 502 U.S. __, __ [116 L.Ed.2d 385, 400, 112 S.Ct. 475]; *Boyde* v. *California* (1990) 494 U.S. 370, 380 [108 L.Ed.2d 316, 328, 110 S.Ct. 1190]; *People* v. *Benson, supra,* 52 Cal.3d at p. 801.) "In addressing this question, we consider the specific language under challenge and, if necessary, the charge in its entirety. [Citation.] Finally, we determine whether the instruction, so

understood, states the applicable law correctly." (*People* v. *Warren* (1988) 45 Cal.3d 471, 487 [247 Cal.Rptr. 172, 754 P.2d 218].)[7]

■ The first sentence of the challenged instruction—"It is legally possible to rape a dead body."—is erroneous. A dead body cannot be raped. But this does not mean the jury would have misunderstood the law regarding rape-felony-murder or the rape special circumstance. A reasonable juror would have understood that for the felony-murder rule and the special circumstance to apply, the defendant must have been attempting to rape the victim at the time of the killing; it would not suffice if, after the killing, defendant acquired the intent to have intercourse with the dead body. The second sentence of the challenged instruction, which clearly was intended to explain the first, correctly stated the rule.

In addition, the remaining instructions correctly informed the jury that the felony-murder rule requires that the killing occur "during the commission or attempt to commit" the felony; that there must be "in the mind of the perpetrator the specific intent to commit" the felony; that rape must be "accomplished against [the victim's] will by means of force, violence, or fear of immediate unlawful bodily injury"; that an attempt requires the "specific intent to commit the crime"; that the rape special circumstance requires that the murder be "committed while the defendant was engaged in the commission or attempted commission of a rape"; and that the special circumstance is not established "if the attempted rape was merely incidental to the commission of the murder."

The arguments of counsel also correctly explained the relevant law. (See *People* v. *Lee* (1987) 43 Cal.3d 666, 677-678 [238 Cal.Rptr. 406, 738 P.2d 752].) The district attorney stressed, "It must be demonstrated that the defendant had the intent, the intent to commit these particularly felonies, rape and robbery, at the time of the deaths of these women." He argued that the "question is what was Mr. Kelly's intent when he was approaching" the victims. Although he stated that "it is possible to rape a dead person," he based his entire argument on the necessity of proving an intent to rape at the time of the shooting. Defense counsel argued, "If she was killed and there was no intent to do anything sexual until afterward, and that intent was formed after her demise, it may not be criminal."

---

[7]In *Boyde, supra,* 494 U.S. 370, the high court adopted the "reasonable likelihood" test for analyzing claims of instructional error. Subsequently, that court occasionally applied a slightly different standard. (See *Estelle* v. *McGuire, supra,* 502 U.S. at p. __, fn. 4 [116 L.Ed.2d at p. 399]; *People* v. *Ashmus* (1991) 54 Cal.3d 932, 977 [2 Cal.Rptr.2d 112].) The court has recently recognized this inconsistency; it reaffirmed the *Boyde* test, and disapproved the inconsistent cases. (*Estelle* v. *McGuire, supra,* 502 U.S. at p. __, fn. 4 [116 L.Ed.2d at p. 399].)

In light of this, we conclude that it is not reasonably likely the jury misunderstood the law regarding the felony-murder rule and the rape special circumstance. *People* v. *Sellers, supra,* 203 Cal.App.3d 1042, which reversed a first degree murder conviction, is distinguishable. There, the defense version of the facts, which was supported by evidence, was "that defendant killed the victim and then left the apartment . . . . Defendant went home, then returned to the scene after an hour or two, washed the victim's body, laid it back on the bed and had intercourse with it." (*Id.* at p. 1049.) The appellate court found that the instructions erroneously allowed the jury to apply the felony-murder rule based solely on the later intercourse with the body, and that the error was prejudicial. (*Id.* at pp. 1050-1055.) Even *Sellers* recognizes, however, that "if the victim dies during an attempted rape which is only consummated after death, the felony-murder rule is fully applicable." (*Id.* at p. 1054.) Here, unlike *Sellers,* the jury was not misled regarding the murder charge.[8]

■ There was, however, error regarding the rape charges. If the jury found that defendant killed the victims while trying to rape them, and had intercourse afterwards, it could find only attempted rape, not completed rape. It is reasonably likely that the jury, told that it is possible to rape a dead body, would conclude otherwise, and believe defendant was guilty of the completed crimes. The error is clearly harmless as to victim Reed because the jury convicted defendant only of attempting to rape her (apparently because of the evidence that the semen found in her body did not come from defendant). The jury, however, convicted defendant of raping victim Houser.

Because the jury was misinstructed on an element of the offense of rape, reversal of this rape conviction is required unless we are able to conclude that the error was harmless beyond a reasonable doubt. (*People* v. *Hayes* (1990) 52 Cal.3d 577, 628 [276 Cal.Rptr. 874, 802 P.2d 376].) We are unable to so conclude as to Houser. This issue was not conceded, and the jury did not resolve it in another context. (*Ibid.*) Although far from conclusive, the physical evidence suggested the possibility of intercourse after death. The evidence showed that the body was probably killed at one place (the pool of blood), then dragged to another spot where it was found. The victim's

---

[8]In theory, there might have been a problem if defendant had never intended to rape the victims alive, but intended at all times to have intercourse with the bodies once dead, and had killed with that intent. Under this scenario, defendant would have had a sexual intent at the time of the killing, but never intended or attempted to rape a live body. Assuming, arguendo, the felony-murder rule and rape special circumstance would not apply in that situation, no evidence supported such a bizarre theory, and the defense never suggested it. Defense counsel argued that no sexual intent arose until after death (which, if believed, would have avoided the felony-murder rule and the special circumstance), not that the intent was always to rape a dead body. There was no hint that defendant was a necrophiliac.

underclothes were found near the seminude body, not where the killing occurred. It is true that defendant repeatedly insisted that he had "sex" with both victims before death, not after. But the verdict of attempted rape as to Reed shows the jury did not necessarily believe this claim. For these reasons, we reverse the rape conviction as to Houser.

 The error would not, however, have affected a conviction of the lesser included offense of attempted rape. When a greater offense must be reversed, but a lesser included offense could be affirmed, we give the prosecutor the option of retrying the greater offense, or accepting a reduction to the lesser offense. (E.g., *People* v. *Edwards* (1985) 39 Cal.3d 107, 118 [216 Cal.Rptr. 397, 702 P.2d 555] [district attorney could retry murder conviction or accept reduction to involuntary manslaughter].) Here, outright reversal of the rape charge would probably require reversal of the accompanying rape special circumstance (*People* v. *Morris* (1988) 46 Cal.3d 1, 17-18 [249 Cal.Rptr. 119, 756 P.2d 843]), and possibly the murder charge itself. (See *People* v. *Green, supra,* 27 Cal.3d at p. 69.) In light of our ultimate affirmance of the judgment of death, it is unlikely the district attorney would prefer to retry the case rather than have the rape charge reduced to an attempt. Therefore, unless the People inform us in a petition for rehearing that they desire to retry the rape charge, we will exercise our authority under section 1260, and simply reduce the rape conviction to attempted rape. The related firearm-use enhancements, the murder, and the rape special circumstances will not be affected.

E. *Contentions Related to the Robbery Charge*

1. *Sufficiency of the Evidence*

Defendant contends there is insufficient evidence to support the robbery conviction. "In reviewing the sufficiency of the evidence, we must draw all inferences in support of the verdict that can reasonably be deduced and must uphold the judgment if, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." (*People* v. *Miranda* (1987) 44 Cal.3d 57, 86 [241 Cal.Rptr. 594, 744 P.2d 1127].)

 Defendant agrees there is sufficient evidence that he stole victim Houser's two rings, but contends there is insufficient evidence that the intent to take them arose before rather than after death. If the intent to steal arose only *after* force was used, the offense is theft, not robbery. (*People* v. *Turner* (1990) 50 Cal.3d 668, 688 [268 Cal.Rptr. 706, 789 P.2d 887]; *People* v. *Ramkeesoon* (1985) 39 Cal.3d 346, 351 [216 Cal.Rptr. 455, 702 P.2d 613].)

 Defendant told the police that he found the rings in a trash can. He claims this statement was "corroborated" by the testimony of Houser's boyfriend, Brown, that she was not wearing the rings when she left home the night before the murder. Because of this, he argues, she must have had them in her purse or elsewhere on her person, and he did not find them until after he dragged the body to the spot where it was found. The purse was found near the body.

The contention misstates the testimony. Brown said Houser was not wearing the rings when he last saw her, but that she "routinely" wore them when she "went out." When he last saw her she was wearing blue jeans. When murdered, she was wearing a leopard skin design dress. The jury could reasonably infer that, following her routine, she put the rings on when she changed her clothes to go out.

Although the evidence was not overwhelming, the jury could also reasonably find defendant intended to steal the rings before he killed her. As we recently noted, "when one kills another and takes substantial property from the victim, it is ordinarily reasonable to presume the killing was for purposes of robbery." (*People v. Turner, supra,* 50 Cal.3d at p. 688.) Substantial evidence supports the verdict.

### 2. *Instructional Contentions Related to the Robbery Charge*

 Defendant also contends that the court prejudicially erred in the robbery instructions. We agree, and reverse the robbery conviction, the related firearm-use enhancement, and the robbery special circumstance. We reject the contention that the error also requires reversal of the first degree murder verdict as to victim Houser.

Although we have found sufficient evidence to support a verdict that the intent to steal arose before death, the evidence was not overwhelming. There was evidence to support a contrary finding, including defendant's statements to the police. The court gave the standard instructions on robbery and the robbery special circumstance, but did not specifically instruct that if defendant formed the intent to steal only after the killing, he was guilty at most of the lesser included offense of theft. We recently rejected defendant's contention that the court had a sua sponte duty to give such an instruction. (*People v. Webster* (1991) 54 Cal.3d 411, 443-444 [285 Cal.Rptr. 31, 814 P.2d 1273].)

However, the court also did not instruct on any lesser included offenses of robbery. This was error. Since there was evidence that defendant was guilty only of theft rather than robbery, the court had a sua sponte duty to instruct

on theft as a lesser included offense. (*People* v. *Turner*, *supra*, 50 Cal.3d at p. 690; *People* v. *Ramkeesoon*, *supra*, 39 Cal.3d at p. 351.) Nothing in the record suggests the error was invited. (See *People* v. *Cooper*, *supra*, 53 Cal.3d at pp. 827-831.)

The error was prejudicial as to the robbery count and the robbery special circumstance. ▮ "An error in failing to instruct on lesser included offenses requires reversal unless it can be determined that the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions." (*People* v. *Ramkeesoon*, *supra*, 39 Cal.3d at pp. 351-352.) We cannot so determine in this case.

In *People* v. *Turner*, *supra*, 50 Cal.3d at pages 690-693, we found similar instructional error harmless, but for reasons which do not apply to this case. In *Turner*, "the jury *was* given special instructions highlighting the issue of 'after-formed intent.' " (*Id.* at p. 691, italics in original.) "In contrast to *Ramkeesoon*, *supra*, 39 Cal.3d 346, the special instructions in this case did require the jury to confront and decide the issue of 'after-formed intent.' The jurors were told emphatically not to convict defendant of robbery or first degree felony murder, or to find the robbery-murder special circumstance true, if they believed it reasonably possible that he killed for reasons unrelated to theft and stole only as an incidental afterthought." (*Id.* at pp. 692-693.)

▮ ▮ Here, the jury was instructed on and found true the robbery special circumstance, but the instructions did not focus on the "after-formed intent" question, or on whether the jury, having found defendant guilty of robbery, could find the robbery special circumstance not true. As we recently explained, although there is no sua sponte duty to give such instructions, their presence or absence is pertinent to "deciding whether reversible *prejudice* had arisen from the trial court's erroneous failure to furnish *any* instructions or verdict forms on lesser included offenses supported by the evidence." (*People* v. *Webster*, *supra*, 54 Cal.3d at p. 444, italics in original.)

Other factors relied on in *Turner* in finding harmless error are absent here. In *Turner*, the jury found first degree felony murder based on robbery and returned a death verdict knowing that a murder in the commission of robbery was the sole basis of the defendant's eligibility for the death penalty. (50 Cal.3d at p. 693.) Here, the jury was instructed on rape-felony-murder as well as robbery, and there were additional special circumstances, including three murders. Unlike *Turner*, we cannot say with confidence that the jury necessarily "considered the question of 'after-formed intent' and rejected this 'mere theft' theory on its merits." (*Id.* at p. 691.) Hence, we reverse the robbery count, the related firearm-use enhancement, and the robbery special circumstance.

██ Defendant argues that the first degree murder conviction as to Houser must also be reversed because the court instructed on robbery-felony-murder as well as rape-felony-murder and premeditated murder. We disagree. ██ The general rule is that when the prosecution presents its case to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand. (*People v. Morris, supra,* 46 Cal.3d at p. 24; *People v. Green, supra,* 27 Cal.3d at p. 69.) ██ Here, we *can* determine that the verdict rested on at least one correct theory. The jury found true the rape-murder special circumstance. Since the jury thus necessarily found the killing was committed in the course of a rape or attempted rape, the robbery instructions were of no consequence to the murder charge. (*People v. Garrison* (1989) 47 Cal.3d 746, 779 [254 Cal.Rptr. 257, 765 P.2d 419].)

F. *Other Instructional Contentions*

1. *CALJIC No. 2.03*

██ Defendant contends the court erred in giving CALJIC No. 2.03, involving consciousness of guilt.[9] Defendant's statements to the police originally denying the crimes provided evidentiary support for the instruction. We have repeatedly upheld the instruction when based upon evidence. (E.g., *People v. Crandell* (1988) 46 Cal.3d 833, 870-871 [251 Cal.Rptr. 227, 760 P.2d 423]; *People v. Green, supra,* 27 Cal.3d at pp. 40-41.) Defendant recognizes this, but claims that the rule must be reassessed in light of our recent decision in *People v. Wright* (1988) 45 Cal.3d 1126 [248 Cal.Rptr. 600, 755 P.2d 1049]. In *Wright,* we explained and limited the circumstances in which a defendant is entitled to a "pinpoint" instruction. (See *People v. Daniels* (1991) 52 Cal.3d 815, 870-871 [277 Cal.Rptr. 122, 802 P.2d 906].) Defendant contends that CALJIC No. 2.03 is in effect a pinpoint instruction favorable to the prosecution, and it is no longer appropriate under the *Wright* analysis.

CALJIC No. 2.03, however, does not merely pinpoint evidence the jury may consider. It tells the jury it may consider the evidence *but it is not sufficient by itself to prove guilt.* (See *People v. Green, supra,* 27 Cal.3d at p. 40.) Defendant obviously does not quarrel with the emphasized language. If the court tells the jury that certain evidence is not alone sufficient to

---

[9]The court instructed: "If you find that before this trial the defendant made willfully false or deliberately misleading statements concerning the charge upon which he is now being tried, you may consider such statements as a circumstance tending to prove a consciousness of guilt, but it is not sufficient of itself to prove guilt."

convict, it must necessarily inform the jury, either expressly or impliedly, that it may at least consider the evidence. Nothing in *Wright* affects such an instruction. There was no error.

### 2. *CALJIC No. 17.01*

 Defendant argues the court had a sua sponte duty to instruct the jury under CALJIC No. 17.01 that it had to unanimously agree upon which act defendant committed as to the rape and robbery charges. (See generally *People* v. *Diedrich* (1982) 31 Cal.3d 263, 280-284 [182 Cal.Rptr. 354, 643 P.2d 971].) He argues the instruction was necessary because the jury could have disagreed as to whether the crimes "were committed before or at the time of each homicide, or were committed afterwards." However, as defendant himself has argued, and we have explained, only actions and intent *before* death could support the rape or robbery charges. To suggest the jury could base guilt on actions after death would have been erroneous. The court had no duty to give a legally incorrect instruction.

## II. *Sanity Phase Issues*

### A. *Constitutionality of Section 25, Subdivision (b)*

 Defendant contends that the California test for insanity, codified in section 25, subdivision (b) (hereafter section 25(b)), is unconstitutionally vague. To place the contention into perspective, a brief historical review is necessary.

"For over a century prior to the decision in *People* v. *Drew* (1978) 22 Cal.3d 333 [149 Cal.Rptr. 275, 583 P.2d 1318], California courts framed this state's definition of insanity, as a defense in criminal cases, upon the two-pronged test adopted by the House of Lords in *M'Naghten's Case* (1843) 10 Clark & Fin. 200, 210 [8 Eng. Rep. 718, 722]: '[T]o establish a defense on the ground of insanity, it must be clearly proved that, at the time of the committing the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; *or*, if he did know it, that he did not know he was doing what was wrong.' (Italics added; see *People* v. *Coffman* (1864) 24 Cal. 230, 235.)" (*People* v. *Skinner* (1985) 39 Cal.3d 765, 768 [217 Cal.Rptr. 685, 704 P.2d 752].)

In 1978, this court abandoned the *M'Naghten* test in favor of the test proposed by the American Law Institute (hereafter sometimes ALI): " 'A person is not responsible for criminal conduct if at the time of such conduct

as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.' " (*People* v. *Drew* (1978) 22 Cal.3d 333, 345 [149 Cal.Rptr. 275, 583 P.2d 1318].)

In June 1982, the electorate passed an initiative measure that, among other things, established the state's first statutory definition of insanity: "In any criminal proceeding . . . in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act *and* of distinguishing right from wrong at the time of the commission of the offense." (§ 25(b), italics added; see *People* v. *Skinner, supra,* 39 Cal.3d at p. 768.)

Despite the use of the conjunctive "and" instead of the disjunction "or" to connect the two prongs, we held in *Skinner, supra,* 39 Cal.3d at page 769, "that section 25(b) was intended to, and does, restore the *M'Naghten* test as it existed in this state before *Drew,*" and that "under that test there exist two distinct and independent bases upon which a verdict of not guilty by reason of insanity might be returned."

As a result of *Skinner, supra,* 39 Cal.3d 765, defendant's vagueness challenge to section 25(b) is nothing less than a challenge to the *M'Naghten* test itself as it existed for over a century in this state and even longer in other parts of the common law world. As we explain, that test passes constitutional muster.

Due process requires a " 'reasonable degree of certainty in legislation, especially in the criminal law . . . .' " (*In re Newbern* (1960) 53 Cal.2d 786, 792 [3 Cal.Rptr. 364, 350 P.2d 116], quoted in *People* v. *Mirmirani* (1981) 30 Cal.3d 375, 382 [178 Cal.Rptr. 792, 636 P.2d 1130].) Thus, a statute must be definite enough to provide (1) a standard of conduct for those whose activities are proscribed and (2) a standard for police enforcement and for ascertainment of guilt. (*Burg* v. *Municipal Court* (1983) 35 Cal.3d 257, 269 [198 Cal.Rptr. 145, 673 P.2d 732], and cases cited therein.) The second of these criteria is the more important (*id.* at p. 269, fn. 15, citing *Kolender* v. *Lawson* (1983) 461 U.S. 352 [75 L.Ed.2d 903, 103 S.Ct. 1855]; *People* v. *Wooten* (1985) 168 Cal.App.3d 168, 174 [214 Cal.Rptr. 36]), especially in this situation. A person does not become sane or insane while committing crimes in reliance upon a statutory definition.

The statute here is reasonably certain. "Many, probably most, statutes are ambiguous in some respects and instances invariably arise under which the

application of statutory language may be unclear. So long as a statute does not threaten to infringe on the exercise of First Amendment or other constitutional rights, however, such ambiguities, even if numerous, do not justify the invalidation of a statute on its face. In order to succeed on a facial vagueness challenge to a legislative measure that does not threaten constitutionally protected conduct—like the initiative measure at issue here [cf. *People* v. *Mirmirani, supra,* 30 Cal.3d at p. 383]—a party must do more than identify some instances in which the application of the statute may be uncertain or ambiguous; he must demonstrate that 'the law is impermissibly vague *in all of its applications.*' " (*Evangelatos* v. *Superior Court* (1988) 44 Cal.3d 1188, 1201 [246 Cal.Rptr. 629, 753 P.2d 585], quoting *Hoffman Estates* v. *Flipside, Hoffman Estates* (1982) 455 U.S. 489, 497 [71 L.Ed.2d 362, 371, 102 S.Ct. 1186], italics added in *Evangelatos.*) Defendant cannot pass this test.

 The *M'Naghten* rule has a long common law history, and has been repeatedly construed in this and other jurisdictions. (See e.g., the cases cited in *People* v. *Skinner, supra,* 39 Cal.3d 765.) " '[A] statute is sufficiently certain if it employs words of long usage or with a common law meaning, "notwithstanding an element of degree in the definition as to which estimates might differ." [Citations.]' " (*Lorenson* v. *Superior Court* (1950) 35 Cal.2d 49, 60 [216 P.2d 859], quoted in *People* v. *Ballard* (1988) 203 Cal.App.3d 311, 317 [249 Cal.Rptr. 806].) The history of the rule virtually precludes us from finding it impermissibly vague at this late date. The concerns that caused us to abandon it in favor of the ALI test in *Drew, supra,* 22 Cal.3d 333, 339-348, did not include vagueness. Defendant cites no case, and we have found none, in which a court or even a party has questioned the test on this ground.

Defendant specifically contends that the phrase "distinguishing right from wrong" is too vague. In *Skinner, supra,* we rejected the Attorney General's argument that the word "wrong" is limited to a "legal, rather than a moral wrong." (39 Cal.3d at p. 778.) We concluded that "a defendant who is incapable of understanding that his act is morally wrong is not criminally liable merely because he knows the act is unlawful." (*Id.* at p. 783; see also *People* v. *Stress* (1988) 205 Cal.App.3d 1259, 1272 [252 Cal.Rptr. 913].)

Defendant now argues that the word "moral" as used in *Skinner, supra,* 39 Cal.3d 765, is too broad, and that it allows "the jurors to apply their *personal moral views* in determining defendant's sanity." (Italics by defendant.) The contention might have some relevance if the statute required jurors to determine guilt if and only if they themselves considered defendant's actions to be morally wrong. The statute does not do this. Murder, rape and robbery

are wrong morally as well as legally. That is not and never was at issue at the sanity phase. Jurors do not have to apply personal moral views to determine this. The relevant inquiry regarding sanity is whether the defendant was *incapable* of distinguishing right from wrong, that is, of realizing that his crimes were morally wrong. There is nothing impermissibly vague in this inquiry. The *M'Naghten* test is constitutional.

### B. *Instructional Contentions*

#### 1. *CALJIC No. 4.00*

The trial court instructed the jury on the defense of insanity in pertinent part as follows:

"It is now your function to determine the issue raised by the defendant's plea of not guilty by reason of insanity.

"Such plea now places before you the issue as to whether he was legally sane or legally insane at the time of the commission of each of these crimes. This is the sole issue for you to determine in this proceeding.

"Although you may consider evidence of his mental condition before and after the time of the commission of the crime, such evidence is to be considered for the purpose of throwing light on the defendant's mental condition as it was when the crime was committed.

"Mental illness and mental abnormality, in whatever form either may appear, are not necessarily the same as legal insanity.

"A person may be mentally ill or mentally abnormal and yet not be legally insane. A person is legally insane when by reason of mental disease or mental defect he was incapable of knowing or understanding the nature and quality of his act or incapable of distinguishing right from wrong at the time of the commission of the offense." (CALJIC No. 4.00.)

 Defendant contends the instruction is ambiguous and misleading in several ways. However, we find no error. The standard instruction correctly and adequately explained the applicable law to the jury, and the court was not required to rewrite it sua sponte. "The trial court cannot reasonably be expected to attempt to revise or improve accepted and correct jury instructions absent some request from counsel." (*People* v. *Wolcott* (1983) 34 Cal.3d 92, 108-109 [192 Cal.Rptr. 748, 665 P.2d 520].)

 Defendant first contends that the reference to a "mental disease or mental defect" prevented the jury from considering the effects of both in

combination. This is an unreasonable interpretation of the instruction. Although the court did not expressly state the jury could consider both a disease and a defect, it did not prohibit such consideration. No reasonable juror would believe an insanity finding could be based upon a mental defect or upon a mental disease, but not both. If defendant believed the instruction was incomplete or needed elaboration in this regard, it was his responsibility to request an additional or clarifying instruction. (*People* v. *Bell* (1989) 49 Cal.3d 502, 550 [262 Cal.Rptr. 1, 778 P.2d 129] [no penalty phase error in referring to "mental disease" without also referring to "mental defect"].)

Defendant next asserts that the instruction erroneously presents the two prongs of the *M'Naghten* test as being synonymous. He quarrels with the instruction's punctuation, gives us a lengthy lesson on grammatical theory, and insists that a semicolon was required to separate the two prongs. (In addition to the oral instruction, the court supplied the jury with a copy of the written instructions.) We believe, however, that the standard instruction is sufficiently clear. If defendant believed the jury might engage in the same tortuous grammatical analysis as he does on appeal, and that a semicolon was needed, he should have requested one. He did not.

Defendant next contends the phrase "knowing or understanding" is grammatically confusing. Again, if defendant believed the jury might engage in a form of grammatical analysis that would make the phrase confusing, he should have requested some sort of clarification. He did not.

Defendant finally contends that instructing that "mental illness and mental abnormality" are not necessarily the same as legal sanity, while also requiring that insanity be based upon a "mental disease or mental defect," is confusing and misleading. The same answer suffices. Defendant should have requested clarification if he believed it was necessary. Absent such a request, we find no error in use of the standard instruction.

## 2. *CALJIC No. 1.00*

At the sanity phase, the court gave a modified version of CALJIC No. 1.00, including that, "As jurors you must not be influenced by pity for a defendant or by prejudice against him. You must not be swayed by mere *sentiment, conjecture, sympathy*, passion, prejudice, public opinion or public feeling. [¶] Both the people and the defendant have a right to expect that you will conscientiously consider and weigh the evidence and apply the laws of the case, *and you will reach a just verdict regardless of what the consequence of such verdict may be*." (Italics added.)

Defendant now objects to the emphasized language as improperly diminishing the jurors' sense of responsibility for the sanity decision. He

appears to contend that in deciding the question of sanity, the jury *may* be swayed by sentiment, conjecture and sympathy, and need not reach a just verdict regardless of the consequences. He relies primarily on language in *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440], reversed on related grounds *sub nomine California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837], that this language should not be given in a capital *penalty* trial. (40 Cal.3d at p. 537 & fn. 7.) He equates a sanity phase with a penalty phase for this purpose. The equation fails.

In *People* v. *Brown, supra,* we pointed out that unlike the guilt phase, where the possible punishment is not a proper matter for juror consideration, at the penalty phase the consequences "are precisely the issue the jury must decide." (40 Cal.3d at p. 537, fn. 7.) For purposes of this issue, a sanity phase is similar to a guilt phase, not a penalty phase. A sanity phase jury does not decide what punishment to impose, but whether a defendant was insane at the time of the crime. This decision, like a guilt decision, has obvious penal consequences. But, unlike a penalty trial, these consequences are prescribed by law, not determined by the jury. A sanity decision, like that of guilt, and unlike that of penalty, is rendered without regard to the consequences.

Defendant also argues that under *People* v. *Skinner, supra,* 39 Cal.3d 765, the second prong of the *M'Naghten* test is a " 'moral' test," thus making sympathy a valid consideration. As we explained in rejecting defendant's vagueness challenge to section 25(b), this is incorrect. The jurors do not decide questions of morality, but only whether the defendant was incapable of distinguishing moral right from wrong. This decision must be based upon the evidence of the defendant's mental state at the time of the crimes, not feelings of sympathy or consideration of the consequences of the decision. There was no error.

### 3. *CALJIC Nos. 4.01 and 17.42*

The court read CALJIC No. 4.01, which informs the jury that a verdict of not guilty by reason of insanity does not mean the defendant will be released from custody, briefly explains the procedures that would be followed in the event of such a verdict, and admonishes the jury not to be concerned about whether or when the defendant would be found sane and released. The court concluded, "It would be a violation of your duty [as] the jury if you were to find the defendant sane at the time he committed the offenses because of a doubt that the Department of Mental Health or the courts will properly carry out their responsibilities."

The court also instructed the jury under CALJIC No. 17.41, "In your deliberations the subject of penalty or punishment is not to be discussed or

considered by you. [¶] This is a matter which must not in any way effect your verdict."

Defendant contends it was contradictory, and thus erroneous, to give the jury information regarding the consequences of an insanity verdict, but also to tell it not to consider such consequences. A brief review of the history behind CALJIC No. 4.01 is needed to place the contention into context. California law originally did not provide for this instruction. (*People* v. *Smith* (1973) 33 Cal.App.3d 51, 73 [108 Cal.Rptr. 698]; see Annot., Insanity Acquittal Instruction (1990) 81 A.L.R.4th 659, 679 & fn. 52.)

Then came *People* v. *Moore* (1985) 166 Cal.App.3d 540 [211 Cal.Rptr. 856], in which the defendant took the opposite position as urged here, and contended the court erred in *refusing* to give such an instruction. The appellate court agreed with the defendant, and found reversible error in *not* giving the instruction. It believed that the danger that a jury might find a defendant sane because of fear that he would be released if found not guilty by reason of insanity "far outweigh[s]" any danger involved in informing the jury about the consequences of an insanity verdict while also telling it not to consider such consequences. (*Id.* at p. 556.) The court held that upon request by the defendant or jury, the trial court should give an appropriate instruction to ensure the jury does not erroneously believe an insanity verdict will result in the immediate release of the defendant. (*Ibid.*) The court in *People* v. *Dennis* (1985) 169 Cal.App.3d 1135 [215 Cal.Rptr. 750] promptly agreed with *Moore*.

CALJIC No. 4.01 was drafted in response to these decisions. It is intended to aid the defense by telling the jury not to find the defendant sane out of a concern that otherwise he would be improperly released from custody. Defendant neither specifically requested nor objected to the instruction. Defense counsel stressed its contents in his argument to the jury. Given the instruction's intent to protect the defense, we do not find it error of which the defendant can complain to give it under these circumstances, and certainly not prejudicial error.

C. *Limitation on Expert Testimony*

During the direct examination of defense expert Dr. Rappaport, the court sustained prosecution objections on relevancy grounds to these questions: (1) "Would it be accurate to say that [the defendant] is often times not able to conform his behavior to what is legally and morally right"; and (2) "Would [it] be accurate to say he cannot always conform his behavior to the requirements of law?"

 Defendant contends the court erred. It did not. The questions were phrased in terms of the American Law Institute test for insanity that we adopted in *People v. Drew, supra,* 22 Cal.3d 333. Only that test makes relevant the ability of the defendant to "conform his conduct to the requirements of law." (*Id.* at p. 345.) As noted previously, the electorate has overturned *Drew,* and reinstated the *M'Naghten* test in California. (*People v. Skinner, supra,* 39 Cal.3d at p. 769.)

The *M'Naghten* test focuses on the ability of the defendant to know or understand the nature and quality of the act or to distinguish right from wrong, not on his ability to conform his conduct to the requirements of law. Indeed, this was an important factor in our decision in *Drew* to abandon the *M'Naghten* test in favor of the ALI test. As we stated, one of the "advantages" of the ALI test was that it "adds a volitional element, the ability to conform to legal requirements, which is missing from the M'Naghten test." (*Drew, supra,* 22 Cal.3d at p. 346.) After the reinstatement of the *M'Naghten* test, the volitional element no longer exists. The defense questions were thus irrelevant, and the trial court properly excluded them. (Evid. Code, § 350.)

Defendant argues that the questions would have elicited answers somehow supporting the expert's ultimate opinion under the applicable *M'Naghten* test. Defendant never stated such a purpose at trial; use of the ALI terminology suggests a different purpose. The court never prevented the defense from eliciting evidence that would support an insanity claim under the applicable test. Indeed, when the expert was eventually asked questions under the *M'Naghten* test, the answers were unfavorable to the defense. (See the summary of the sanity phase evidence, *ante.*)

In any event, if the defense *had* offered the evidence as relevant to the *M'Naghten* test, and not merely the ALI test, it was obligated to make known to the court the "substance, purpose, and relevance of the excluded evidence . . . ." (Evid. Code, § 354.) ▬ The failure of the defense to do so precludes a finding of reversible error. (*Ibid.*; see *People v. Whitt* (1990) 51 Cal.3d 620, 648 [274 Cal.Rptr. 252, 798 P.2d 849].)[10]

### D. *Alleged Prosecutorial Misconduct*

 The district attorney argued to the jury, "But the I.Q. test has absolutely nothing to do with mental illness. I asked Dr. Rappaport about

---

[10]Citing sections 28 and 29, the Attorney General argues that the court properly excluded the evidence because it embraced the ultimate issue to be decided by the jury. We disagree. Whatever the meaning of sections 28 and 29 (we express no opinion), they do not apply to the sanity trial. Section 28 expressly does not apply to "an insanity hearing" (§ 28, subd. (c)), and section 29 applies only to the "guilt phase of a criminal action." When the prosecution asked ultimate questions under the *M'Naghten* test, the court properly allowed them over defense objection.

that and basically came out that a person can have an extremely good I.Q. and high I.Q. and still be mentally ill or not. [¶] And you can have a low I.Q. and be mentally ill or not. There really is no correlation from one or the other." He also argued, "And even if you conclude he's got a mental illness of some sort, that doesn't change the fact that he was legally sane at the time that he committed these offenses. [¶] Doesn't change that at all. [¶] Mental illness and legal sanity or insanity are two different things in the law of the State of California."

Defendant contends both arguments were misconduct. Since an objection and admonition could have cured any harm, the matter has been waived by the failure to object. (*People* v. *Benson, supra,* 52 Cal.3d at p. 794.) Defendant contends his attorney was ineffective for not objecting. We disagree. An attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel. (*People* v. *Frierson, supra,* 53 Cal.3d at pp. 747, 749.)

 In any event, there was no misconduct. Defendant first contends the district attorney referred to matters outside the record. He did not. Dr. Rappaport's testimony fully supported the argument. He testified that persons with either a high or a low IQ could either be mentally ill or not, and that there is "not necessarily" any correlation between IQ and mental illness. Any disagreement as to the meaning of this testimony and the significance of the rest of the evidence merely presents a question for the jury. The argument came well within the broad discretion of the parties to state their views as to what the evidence shows and what inferences may be drawn therefrom. (*Kelly I, supra,* 51 Cal.3d at p. 967.)

Defendant also contends the argument that mental illness and insanity are "two different things" misstates the law. We disagree. Although mental illness (or defect) may cause insanity, the concepts are different. Mental illness is a medical diagnosis; it alone does not necessarily establish legal insanity. A defendant must also show that the illness made him insane under the prevailing *M'Naghten* test. (See generally *People* v. *Skinner, supra,* 39 Cal.3d 765.) The district attorney never suggested that mental illness *cannot* establish insanity; he merely argued that even if the jury found that this defendant suffered from a mental illness, he was still sane. Both sides are entitled to argue the significance of any mental illness on the question of sanity.

 Defendant has also not shown prejudice from the failure to object. Although defendant presented evidence of mental illness and defect, he presented virtually no evidence that he was insane. Even his two experts

essentially conceded that defendant was sane under the *M'Naghten* test. It is not reasonably probable the jury would have found defendant insane even if counsel had successfully objected to this argument. (*People* v. *Frierson, supra,* 53 Cal.3d at p. 747; see also *People* v. *Cruz* (1980) 26 Cal.3d 233, 251 [162 Cal.Rptr. 1, 605 P.2d 830].)

III. *Penalty Phase Issues*

A. *Admission of Riverside County Confession*

■ At the penalty phase, the prosecution presented evidence of defendant's confession to the murder of Danny O. in Riverside County. (See *Kelly I, supra,* 51 Cal.3d at pp. 945-947.) Defendant did not object, thus waiving the matter on appeal. (See pt. I. B. of Discussion, *ante.*) He now contends the confession was inadmissible, and his attorney was ineffective for not objecting. He relies on the pertinent record in *Kelly I,* which he requests us to judicially notice. For purposes of deciding the ineffectiveness claim, we grant the request. We need not decide whether counsel should have objected in this case, for defendant has not shown prejudice. After reviewing the very record defendant asks us to judicially notice, in which there *was* an objection, we held that the Riverside confession was admissible. (*Kelly I, supra,* 51 Cal.3d at pp. 947-954.)

B. *Evidence of the Circumstances of the Riverside County Crimes*

Defendant challenges on several grounds the evidence of the circumstances of the Riverside County crimes. We have repeatedly rejected the contentions. (E.g., *People* v. *Fierro, ante,* pp. 173, 230-232 [3 Cal.Rptr.2d 426, 821 P.2d 1302]; *People* v. *Ashmus , supra,* 54 Cal.3d at p. 985 & fn. 15.) ■ As explained in those cases, evidence of a defendant's other violent criminal conduct, including all of the pertinent circumstances, is admissible whether or not the defendant has also been convicted of the crimes. The fact that defendant offered to stipulate to some of the facts and to his convictions of the crimes does not change the admissibility of the prosecution evidence. "Surely, testimony by a live witness is not barred." (*People* v. *Ashmus, supra,* 54 Cal.3d at p. 985.)

C. *Failure to Hold a Second Competency Hearing*

During jury selection, defense counsel expressed doubt about defendant's competency to stand trial, and requested the court to conduct a hearing on the question. Counsel recited in detail the facts giving rise to this doubt— essentially defendant's mental defects and developmental disablement, and

his apparently deteriorating psychological and emotional condition. Based upon these representations, the court also expressed doubt as to defendant's competency, continued the trial pending resolution of the question, and appointed two doctors and the Inland Regional Center for the Developmentally Disabled to examine defendant. The defense requested a jury trial on the question.

All the experts found that defendant *was* competent to stand trial. Defense counsel therefore withdrew the request for a jury trial. The court read the written reports, and found that defendant was competent to stand trial. It then recommenced jury selection in this case, and the trial proceeded to its conclusion. The question of defendant's competency to stand trial was never raised again.

Defendant contends that the court erred in not holding a new competency hearing at some point during the evidence portion of the trial, and that his attorneys were ineffective for not raising the matter again. He selects certain portions of the defense evidence presented at the sanity and penalty phases, and claims they presented substantial evidence of present incompetency compelling further proceedings.

We recently stated the applicable law in *People* v. *Jones* (1991) 53 Cal.3d 1115 [282 Cal.Rptr. 465, 811 P.2d 757]:

"A defendant who, as a result of mental disorder or developmental disability, is 'unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner,' is incompetent to stand trial. (§ 1367.) When the accused presents substantial evidence of incompetence, due process requires that the trial court conduct a full competency hearing. (*People* v. *Stankewitz* (1982) 32 Cal.3d 80, 92 [184 Cal.Rptr. 611, 648 P.2d 578, 23 A.L.R.4th 476].) Evidence is 'substantial' if it raises a reasonable doubt about the defendant's competence to stand trial. (*Moore* v. *United States* (9th Cir. 1972) 464 F.2d 663, 666.) The court's duty to conduct a competency hearing arises when such evidence is presented at any time 'prior to judgment.' (§ 1368; see also § 1367; *People* v. *Zatko* (1978) 80 Cal.App.3d 534, 548 [145 Cal.Rptr. 643]; *People* v. *Melissakis* (1976) 56 Cal.App.3d 52, 62 [128 Cal.Rptr. 122].)

"When a competency hearing has already been held and defendant has been found competent to stand trial, however, a trial court need not suspend proceedings to conduct a second competency hearing unless it 'is presented with a substantial change of circumstances or with new evidence' casting a serious doubt on the validity of that finding. (*People* v. *Zatko, supra,* 80

Cal.App.3d at p. 548; *People* v. *Melissakis, supra,* 56 Cal.App.3d at p. 62.)"
(*People* v. *Jones, supra,* 53 Cal.3d at pp. 1152-1153.)

 Under this standard, there was no need to conduct a second competency hearing, and defense counsel was not obligated to request one. There was no evidence of a change of circumstances, much less a substantial change. The substance of the defense testimony relied upon on appeal was generally included in the facts defense counsel recited when they expressed their doubts as to competency in the first place. The testimony defendant now cites did not specifically address defendant's present competency, and gave no reason to doubt, and certainly no reason to seriously doubt, the continuing validity of the unanimous expert opinion and the court finding that *did* specifically address the subject.

D. *Defendant's Motion to Stay This Appeal Pending a Determination of His Current Competency*

 In a separate motion, defendant contends he is currently incompetent to cooperate with his counsel, and seeks a stay of all postjudgment proceedings in this case and the appointment of a referee to determine his competency. He asks that the stay remain in effect until such time, if ever, that he regains his competency. Attached to the motion are the declarations of a psychiatrist, a physician, a therapist, defendant's mother, and three of his current attorneys, and copies of medical records from San Quentin State Prison.

We have doubts about the sufficiency of defendant's factual showing. Defendant has recently hired a new battery of experts who support his claim of incompetency. However, defendant's mental state is not a question of first impression. Defendant had a jury trial on the question of his sanity at the time of the offenses. Several experts examined him on this point, and the jury found him sane. During trial, the proceedings were delayed while defendant's competency to stand trial was litigated. The court appointed various experts to examine defendant. They unanimously found him competent, and the court made the factual determination that he was competent.

A massive record regarding defendant's mental state thus already exists, including opinions reached by neutral experts not chosen by either side. Defendant's current factual allegations are similar in some respects to those that occasioned the prior competency hearing, including alleged bizarre behavior on defendant's part. Indeed, defendant now seems to assert that he was incompetent at trial as well as now, without acknowledging that that question was litigated and resolved adversely to him. For example, Dr.

Lewis, the psychiatrist defendant relies on most heavily, found evidence that his mental condition now is similar to what it was "at and subsequent to the time of his trial in San Bernardino."

Defendant ignores this extensive history. His new experts do not attempt to explain whether or why they disagree with the court-appointed experts, or what has happened in the interim to render the prior findings invalid, or even whether the prior reports were made available to them. The declaration of Dr. Lewis indicates, for example, that defense counsel provided her with declarations by new experts which support the claim of incompetency, but she was apparently given none of the reports of the court-appointed experts who had examined defendant for the identical purpose. It is not clear whether Dr. Lewis was even aware that she was revisiting well-trodden territory. Defendant's attempt to evaluate his mental condition anew, but only with experts of his choosing given only selective information, also of his choosing, is not persuasive.

Defendant should confront the past findings. New witnesses should be made aware of, and should consider, contrary opinions, especially those by neutral experts. They should explain what new evidence or substantial change in circumstances exists to cast a serious doubt on the validity of the prior finding of competency. (See *People* v. *Jones, supra,* 53 Cal.3d at pp. 1152-1153.) Simply finding new experts and ignoring the past is not sufficient.

We do not, however, rely on any inadequacy in the factual showing in denying the motion. We believe the appeal can proceed even if defendant has become incompetent.

Section 1367 provides in pertinent part that "A person cannot be tried or adjudged to punishment while such person is mentally incompetent." Section 1368, subdivision (a), establishes a procedure to follow if a doubt arises as to defendant's competency "during the pendency of an action and *prior to judgment* . . . ." (Italics added.) This language clearly indicates the Legislature did not prohibit *postjudgment* proceedings even if the defendant is incompetent. Similarly, a defendant has a constitutional right not to be *tried* while incompetent (*Drope* v. *Missouri* (1975) 420 U.S. 162 [43 L.Ed.2d 103, 95 S.Ct. 896]), but no case has extended this right to the appeal.

A state may also not constitutionally execute an insane person. (*Ford* v. *Wainwright* (1986) 477 U.S. 399 [91 L.Ed.2d 335, 106 S.Ct. 2595].) California has its own statutory procedure for determining whether a person is insane for purposes of execution. (§ 3700.5 et seq.; see *People* v. *Riley*

(1951) 37 Cal.2d 510 [235 P.2d 381].)[11] But nothing in *Ford* or the statutes suggest that litigation regarding the validity of the judgment of death cannot continue even if the defendant is presently insane.

Defendant contends that his right to "meaningful appellate review" and right to the effective assistance of counsel under the state and federal Constitutions preclude proceeding with the appeal if he is incompetent. We disagree. The United States Supreme Court has not specifically decided this question, but has done so by implication. In *Whitmore* v. *Arkansas* (1990) 495 U.S. 149 [109 L.Ed.2d 135, 110 S.Ct. 1717], the high court held that a person has standing to bring a "next friend" challenge to a judgment of death only in limited circumstances. A "next friend" must show "that the real party in interest is *unable to litigate his own cause due to mental incapacity*, lack of access to court, or other similar disability." (*Id.* at p. 165 [109 L.Ed.2d at p. 151, 110 S.Ct. at p. 1728], italics added.) The emphasized language implies that mental incompetence, although a basis for allowing "next friend" standing to challenge the judgment, does not require cessation of postjudgment proceedings. Here, of course, "next friend" status is unnecessary, since defendant is fully represented by counsel who can protect his interests.

The Arizona Supreme Court recently confronted this question in a capital case. In *State* v. *White* (Ariz. 1991) 815 P.2d 869, 878, the court, agreeing with the Michigan Court of Appeals in *People* v. *Newton* (1986) 152 Mich.App. 630 [394 N.W.2d 463], vacated on other grounds (1987) 428 Mich. 855 [399 N.W.2d 28], a noncapital case, refused to order a mental examination after the defendant made a prima facie showing of incompetency to assist in the appeal. The court noted "the American Bar Association's position, as expressed in the *ABA Criminal Justice Mental Health Standards* (1989). *Standard* 7-5.4 (c) provides that: 'Mental incompetence of the defendant *during the time of appeal* shall be considered adequate cause, upon a showing of prejudice, to permit the defendant to voice, *in a later appeal or action for postconviction relief*, any matter not raised on the initial appeal because of the defendant's incompetence.' (Emphasis added.) The *Standard* contemplates that an appeal proceed despite a defendant's incompetence to assist the appeal. '[C]onvicted defendants, like parties to appellate litigation in general, do not participate in appeal proceedings.' *Id.*, *Commentary Introduction*. Therefore 'mental incompetence rarely affects the fairness or accuracy of decisions.' *Id.* Defendant was not denied due process of law." (*State* v. *White*, *supra*, at p. 878.)

We agree with *State* v. *White*, *supra*, 815 P.2d 869. The considerations that prohibit an incompetent person from being *tried* (*Drope* v. *Missouri*, *supra*,

---

[11]Defendant's sanity for execution purposes is not now at issue since an execution date has not even been set. We obviously express no opinion on any issues that may arise on that question.

420 U.S. 162; § 1367), do not apply after the judgment. The issues on appeal are limited to the appellate record. (*People* v. *Szeto* (1981) 29 Cal.3d 20, 35 [171 Cal.Rptr. 652, 623 P.2d 213].) An appeal involves only legal issues based on that record. Attorneys do not need to rely on the defendant himself to decide what issues are worthy of pursuit.

Furthermore, "At trial, a defendant is confronted with the prosecutorial forces of organized society and immersed in the intricacies of the substantive and procedural law. A defendant who is not competent to assist trial counsel in presenting an adequate defense may be unjustly convicted because he lacks competence to respond to the criminal accusations against him. A post-conviction proceeding, on the other hand, is not part of the criminal process itself; it is a collateral attack on the judgment and is considered civil in nature. . . . The defendant's guilt or innocence is not at issue; rather, a post-conviction proceeding is a new proceeding in which the petitioner raises constitutional challenges to the original conviction which have not already been adjudicated." (*People* v. *Owens* (1990) 139 Ill.2d 351 [151 Ill.Dec 522, 564 N.E.2d 1184, 1189], citations omitted.)

We thus see no reason why the appeal may not proceed even if the defendant is incompetent as long as he is represented by able counsel, as this defendant is.

Defendant has moved to stay *all* postjudgment proceedings. Since none are currently pending other than this appeal, there is nothing else to stay. Arguably the situation is different regarding potential habeas corpus challenges, which may be based on matters outside the appellate record. (Cf. *People* v. *Owens, supra,* 564 N.E.2d 1184.) We cannot rule on the question in a vacuum. We suspect that most, if not all, potential challenges in a habeas corpus proceeding could be made without additional input from defendant. Current defense counsel have access to the appellate record, to investigators, to trial counsel's case files, and to the knowledge and experience of trial counsel. As suggested in *State* v. *White, supra,* 815 P.2d at page 878, defendant's alleged incompetency might be grounds for the untimely raising of an issue if it could not have been raised earlier because of that incompetency. The prohibition against executing an insane person provides additional protection for someone who, because of incompetency, was unable to pursue a meritorious challenge to the judgment.

For these reasons, current counsel can and should seek to challenge the judgment even if defendant is currently incompetent. If, in a petition for a writ of habeas corpus, counsel make a specific showing why specified contentions require defendant's ability to cooperate, and why the necessary

information cannot be obtained from other sources, we will consider the question at that time. Additionally, if a prima facie showing is made on any contention, and an evidentiary hearing is ordered, defendant may raise the question of his competence to participate in the evidentiary hearing at that time.

We therefore deny defendant's motion to stay these appellate proceedings.

E. *Defense Counsel Informing Jury of Prior Judgment of Death*

During cross-examination of a prosecution penalty phase witness, defense counsel deliberately elicited testimony that defendant had previously been found guilty of the Riverside County crimes and had received the death penalty. Counsel also referred to the prior judgment of death while examining the defense penalty phase expert Dr. Craig Rath, and discussed it extensively during argument to the jury.

Defendant contends his attorney was ineffective in causing the jury to learn of the prior judgment of death. He contends this prejudicially diminished the jury's sense of responsibility for its own penalty decision. (See *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633].) We disagree. Although there was certainly a danger the information might reduce the jury's sense of responsibility, defense counsel reasonably could, and obviously did, believe that on balance, the information, in conjunction with the use counsel made of it, would increase the chances of the defense avoiding a second death verdict.

We have previously outlined the applicable law. (See pt. I. B. of Discussion, *ante*.) The fact that defense counsel pointedly and repeatedly referred to the prior judgment strongly implies that he believed it was in his client's best interests to do so. The jury in the first trial, having heard essentially the same testimony as in this case, returned a death verdict. This suggests that unusual tactics might be appropriate in the second trial to try to avoid the same result. The record suggests two specific tactical reasons for counsel's decision.

First, counsel elicited testimony from Dr. Rath that because of the prior death judgment, defendant would have little motivation to cooperate at the second trial, and he might "just go[] along for the ride."

Second, the murder of Danny O., an 11-year-old boy who was heroically trying to save his cousin from defendant's clutches, in which defendant applied the coup de grace with a bullet between the eyes from close range

while the boy was pleading for his life, was obviously and reasonably of great concern to counsel. Reasonable counsel could worry that the jury would wonder whether defendant had received the death penalty for that murder. If not informed that he had, the jury might impose the death penalty itself just in case he had not received it the first time whether or not it felt the death penalty was warranted in *this* case. Informing the jury of the earlier verdict would protect against this danger.

Counsel effectively used the prior judgment in closing argument. He argued that defendant had already been sentenced to death for the earlier murder, so the jury need not duplicate that verdict. He also suggested to the jury that this second prosecution was, literally and figuratively, overkill and somehow unfair to defendant. He stated, for example, that "it's almost like double jeopardy," and that "two cyanide tablets instead of six will be plenty adequate."[12]

The decision whether to inform the jury of the prior verdict exemplifies the difficult tactical decisions that counsel may, indeed must, make without fear of appellate second-guessing. Unlike appellate counsel, trial counsel was present at trial and had a feel for the jury, which he helped select. Only he could fully weigh the risks and benefits of informing that jury of the prior verdict. Counsel was not ineffective in making this difficult but important decision.

### F. *Davenport Error*

Without objection, the district attorney argued that the absence of two of the statutory mitigating factors—whether the victims participated in or consented to the homicidal acts, and whether the defendant reasonably believed there was a moral justification or extenuation for his conduct—was itself aggravating. Defendant correctly contends this was error (*People v. Davenport* (1985) 41 Cal.3d 247, 289-290 [221 Cal.Rptr. 794, 710 P.2d 861]), and argues that his attorney was ineffective for not objecting. We need not decide whether counsel should have objected, for we are satisfied that the error was harmless. The court instructed that the "absence of a mitigating

---

[12]Counsel also argued on rebuttal that defendant has "already suffered the supreme sanction for what he did in Riverside. . . . [¶] He can only be executed once and going to be probably in the normal course of legal proceedings in this state, going to have that happen to him for what he did in Riverside. . . . [¶] What occurred there has nothing to do with what occurred here, other than the fact that Horace is in essence on trial again for the same things in a sense. [¶] And I think that is manifestly unfair. There certainly should be seemingly some limitation as to how much pressure and how hard the government comes down on one human being. He can only die once for Riverside and he's going to die for Riverside. [¶] That is not a problem for you. The problem for you to decide is what is the disposition based on the evidence you've heard in this trial concerning Houser and Reed."

factor in and of itself does not make that factor an aggravating circumstance," and that the jury should consider each sentencing factor only "if applicable." The jury was not misled about the nature of its weighing process. Indeed, the district attorney stressed that the weight, not the number, of the aggravating and mitigating factors was important, and that the weight to be given the factors was for the jury to decide. Under these circumstances, "a reasonable jury would not assign substantial aggravating weight to the absence of unusual extenuating factors." (*People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1234 [275 Cal.Rptr. 729, 800 P.2d 1159]; see also *People* v. *Gallego* (1990) 52 Cal.3d 115, 200-201 [276 Cal.Rptr. 679, 802 P.2d 169].)

### G. *Instructions on Violent Criminal Activity and Prior Felony Convictions*

The court instructed the jury it could consider as aggravating factors both other violent criminal activity (§ 190.3, factor (b)) and any prior felony conviction (§ 190.3, factor (c)). It further instructed that "evidence has been introduced for the purpose of showing that the defendant . . . has been convicted of the crimes of murder and attempt kidnapping in Riverside County prior to the offense of murder in the first degree for which he has been found guilty in this case," and that "evidence has been introduced for the purpose of showing that the defendant . . . has committed . . . murder in the first degree and attempt kidnapping . . . ."

Defendant contends the court erroneously allowed double counting of factors (b) and (c) of section 190.3. We have, however, held that such double counting is generally permissible, as each factor has a separate purpose. (*People* v. *Melton* (1988) 44 Cal.3d 713, 764-765 [244 Cal.Rptr. 867, 750 P.2d 741].)

Defendant next contends the instructions wrongly suggested that he had suffered the convictions *before* he committed the crimes of this case. Although the instructions, viewed in isolation, were ambiguous, in context, no reasonable juror could have believed the court was referring to convictions suffered before the murders. The jury knew that the murder of Danny O. occurred a few days *after* the murders in this case. It knew that defendant was arrested for the three murders, and was first prosecuted in Riverside County for the crimes committed there, then for the crimes committed in San Bernardino County. No other crimes were ever mentioned. Indeed, the defense repeatedly stressed that defendant had no criminal record at all when he committed these murders. There was no possible prejudice to defendant in this regard.

Error of a different kind *was* committed, however. A felony conviction is admissible as an aggravating factor only if it was entered before the

capital crime. (*People* v. *Webster, supra,* 54 Cal.3d at p. 453; *People* v. *Balderas* (1985) 41 Cal.3d 144, 201 [222 Cal.Rptr. 184, 711 P.2d 480].) Here, the convictions were entered afterwards. Nevertheless, the error was harmless. The convictions and the facts of the underlying crimes were properly considered as evidence of other violent criminal conduct. Once the facts of the Danny O. murder were disclosed, " '[t]he additional fact that defendant was *convicted* of that offense could have added very little to the total picture considered by the jury . . . .' " (*People* v. *Webster, supra,* 54 Cal.3d at p. 454, quoting *People* v. *Morales, supra,* 48 Cal.3d at p. 567, italics in original; see also *People* v. *Ashmus, supra,* 54 Cal.3d at p. 999.)

### H. *Miscellaneous Contentions*

Defendant reiterates various contentions we have previously rejected:

(1) that the court was required to instruct the jury it could consider violent criminal activity and any other aggravating factor only if it *unanimously* agreed that such factor existed (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1273 [270 Cal.Rptr. 451, 792 P.2d 251]; *People* v. *Miranda, supra,* 44 Cal.3d at p. 99);

(2) that the court was required to instruct the jury the prosecution had the burden of proof with respect to other-crimes evidence, and the defendant was presumed innocent of such charges (*Kelly I, supra,* 51 Cal.3d at pp. 965-966);[13]

(3) that the court was required to instruct the jury it could impose the death penalty only if it found beyond a reasonable doubt that the aggravating circumstances substantially outweighed the mitigating circumstances and that death was the appropriate punishment (*Kelly I, supra,* at p. 969);

(4) that the court erroneously failed to delete all inapplicable mitigating factors from its instruction, specifically factors (e), (f), (g) and (j) of section 190.3 (*Kelly I, supra,* at p. 968);

(5) that the court erroneously failed to delete "extreme" from "extreme mental or emotional disturbance" (*Kelly I, supra,* at pp. 968-969; *People* v. *Benson, supra,* 52 Cal.3d at pp. 803-804);

(6) that the death penalty may be imposed only for a deliberate and premeditated murder (*People* v. *Webster, supra,* 54 Cal.3d at p. 456; see also

---

[13]Defendant contends the jury might have inferred from the evidence that he attempted to commit certain uncharged sexual offenses. On the contrary, the court specifically told the jury it could not consider any criminal activity other than the murder and attempted kidnapping of which defendant previously had been convicted.

*People* v. *Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306] [finding no equal protection violation]); and

(7) that the court erroneously failed to require a written statement from the jury detailing the evidence upon which it relied and its reasons for imposing the death penalty (*Kelly I, supra,* at p. 970).

We adhere to our previous decisions.

I. *Prejudicial Effect of the Errors*

We have found that the rape conviction must be reduced to attempted rape, that the robbery charge and accompanying robbery-murder special circumstance must be reversed, and that two minor penalty phase errors were committed (prosecution argument that the absence of a mitigating factor is itself aggravating, and instruction that the Riverside County *convictions* were aggravating factors). Defendant contends that the cumulative effect of these errors requires reversal of the penalty judgment. We disagree.

The jury properly considered all of the *evidence*. It was well aware of the circumstances under which the murders were committed. (*People* v. *Hayes, supra,* 52 Cal.3d at p. 644.) If it believed defendant had intercourse with Houser after death, and thus erroneously convicted him of raping her instead of attempting to do so, it would not have given significant independent weight to that conviction as distinguished from the facts of the offense. Similarly, if the jury found defendant first intended to steal the rings after death, but nevertheless erroneously convicted him of robbery, it would not have given significant independent weight to that conviction or to the robbery special circumstance. The penalty phase errors were likewise insignificant.

The court instructed the jury, and both counsel stressed, that it was not to merely count the number of factors but to give each the weight to which it was entitled. Under these circumstances, and given the number and heinous nature of the murders, we find no reasonable possibility the errors, singly or in combination, affected the penalty verdict. (*People* v. *Beardslee* (1991) 53 Cal.3d 68, 117 [279 Cal.Rptr. 276, 806 P.2d 1311]; *People* v. *Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135].)

From our review of the record, we are persuaded that defendant received a fair and untainted penalty trial. The Constitution requires no more. (*Kelly I, supra,* 51 Cal.3d at p. 970.)

## CONCLUSION

The rape conviction is reduced to attempted rape. The robbery conviction, the related firearm-use enhancement, and the robbery-murder special circumstance are reversed. In all other respects, the judgment is affirmed.

Lucas, C. J., Mosk, J., Panelli, J., Kennard, J., Baxter, J., and George, J., concurred.

Appellant's petition for a rehearing was denied March 11, 1992.