Filed 3/22/16  P. v. Williams CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>PATRICK ALLEN WILLIAMS,<br><br>        Defendant and Appellant. | A143871<br><br>(Lake County Super.<br>Ct. No. CR932173) |

A jury found defendant Patrick Allen Williams guilty of committing a lewd or lascivious act upon a child under the age of 14 (Pen. Code, § 288, subd. (a)), and he was sentenced to state prison for eight years.  His sole claim of error is that his trial counsel was constitutionally ineffective in three particulars.  We conclude this contention lacks merit, and affirm.

## BACKGROUND

In brief, defendant is the father of the victim, who will hereafter be referred to as such.  They lived with an infant sister, and defendant's wife, who was also the victim's mother, and will hereafter be referred to as such.  The three of them initially lived with the wife's mother, who was also the victim's grandmother, who will hereafter be referred to the grandmother. Thereafter, and at most relevant times, defendant, his wife, and the victim lived in a trailer adjacent to the home of the wife's grandmother and the victim's great-grandmother.  This woman will be referred to as the great-grandmother.  And they were living in this trailer when in March 2013 the victim made her initial allegation of sexual abuse by defendant.

1

The trial occurred in October of the following year. The prosecution's case-in-chief commenced with the six-year-old victim, who had been found qualified to testify at the conclusion of a hearing held pursuant to Evidence Code section 402. The victim told the jury that she "used to live" with defendant, "when he had sex with me." Defendant put his "dick" "in my mouth," and "it happened a lot." The family was getting ready to move when the victim told the grandmother about this situation, and "made her call the cops on him" so that he would stop. A prominent theme of defense counsel's cross-examination was to discover whether the victim had been coached in her testimony by various family members.

The grandmother testified that the family had decided to move to Utah when the victim approached and told her about what defendant was doing to her with his "dick." After discussing the matter with the great-grandmother, the grandmother "called CPS." Defense cross-examination elicited that the call was made two days before the planned move, when the grandmother was depressed and seeing a physician "because my husband had left."

Sherri De La Torre, a Lake County Child Welfare Services social worker, was the first professional called to the scene. She arrived at the grandmother's home on March 4, 2013. It was then she realized that she was a social acquaintance of the grandmother, which De La Torre believed posed a conflict of interest. Nevertheless, De La Torre did an initial interview with the victim, alone. De La Torre was sensitive to signs of coaching by the grandmother, but she detected no undue influence. De La Torre also took account of the grandmother telling her that the family was moving that day. The victim told De La Torre that "daddy had made her bounce on his dick," and did so "all the time." De La Torre posed standard questions designed to test if the victim knew the difference between truth and falsehood. De La Torre believed the victim knew the difference.

Social worker Carrie Bridges arrived to relieve De La Torre. She was met by Deputy Sheriff Keener. After an initial period of feeling uncomfortable with the strangers, the victim began answering their questions. De La Torre remained, not to ask

2

questions, but to help the victim get over her fright at the deputy "in full uniform." The grandmother was not present during the interview, but Bridges had spoken with her about what the victim had said and to what extent she had been questioned by the grandmother. At some point the victim stated that defendant's "dick" was inside her.

The victim was taken into protective custody. Later that day, the victim was being transported to a more extended (and recorded) interview when, according to Bridges, the victim "spontaneously said . . . she hoped that we could get her daddy help."

That interview took place at the Multi-Disciplinary Interview Center (MDIC). Bridges observed the interview on a video screen. The interview was conducted by Denise Hinchcliff, a trained and experienced child abuse investigator. The interview was recorded—a recording that was viewed by the jury—and ended when the victim refused to talk about, in Hinchcliff's words, what "she had already told me."

The victim was taken into foster care. Several days later, she spontaneously spoke to the caregiver of the "things that he [defendant] did to her with his dick . . . ." This happened almost every time the victim took a bath. According to the caregiver: "She was pretty matter of fact and went into a lot of details." The victim stated that when defendant put "[h]is dick in her mouth" "[I]t squirted and she shivered and she said it tasted yucky."

The victim was given another MDIC interview on March 14. It was also conducted by Hinchcliff, and again observed by Bridges. This time the victim was "very forthcoming with information," specifically, that "her dad put his dick in her mouth and in her butt." The jury was shown the recording and could thus verify Hinchcliff's characterization that the victim "was able to describe things . . . about his penis."

Defense counsel cross-examined Hinchcliff about her interview techniques and the idea of whether the victim was merely repeating what had been told her by others, but not at length, because the jury would be able to judge for itself from the recording.

After this, a dependency proceeding was initiated (which was still ongoing at the time of the trial). The victim had no contact with the grandmother from the time she (the victim) was taken into care until she was re-interviewed on March 14/15.

3

Social worker Bridges was present when the victim was given a medical examination at a hospital on March 12. The results were inconclusive: the examiner "could not say that she [the victim] was not violated," yet what the examiner observed was "consistent with the history" of what the victim stated was done to her that was provided to the examiner.

Defendant testified that he did nothing inappropriate with the minor. His relations with the grandmother were not always smooth. Defendant's mother testified that she never had a concern for the victim's safety or any reason to think "there was some kind of sexual abuse going on." Defendant's mother also testified that at some point after defendant had been arrested, the victim inquired "did you hear what [grandmother] told me to say about daddy?" (Her testimony that she passed this on was denied by the social worker for the victim's dependency.)

Two experts testified for the defense: Dr. Lee Coleman and Dr. Steven Gabaeff. Child psychiatrist Dr. Coleman had considerable experience with suspected sexual abuse victims' interviews. He testified that the techniques and questions used in the MDIC interviews were slanted to produce a conclusion of abuse. Which they did: "I believe the best explanation [for] what the child did . . . . [¶] . . . [¶] [was] she was trying to avoid the interviewer because she was tired of telling the interviewer something that over and over again the interviewer wouldn't accept and just kept after her."

Dr. Gabaeff has "a clinical forensic medical practice," and has made more than 20,000 photograph examinations of children. He testified that after reviewing the documents generated by the case, but not the victim herself, as to the opinion that the victim had suffered sexual penetration, he agreed "[n]ot at all." Indeed, the result of the exam performed was "100 percent inconsistent with the history as provided by the child." In fact, Dr. Gabaeff called actual penetration by an adult male "virtually impossible." He summarized his testimony at the start of cross-examination: "I'm not testifying that she was not sexually assaulted in any way. I'm testifying that there's no physical evidence of penetration. And that other forms of sexual assault may have occurred, but penetration would not have been one of them."

4

## DISCUSSION

Defendant points to three instances of inaction by his trial counsel as establishing the professional incompetence of such magnitude as to compel reversal, all of which center around trial counsel's failure to object to the introduction of evidence. After setting the governing principles, we discuss the incidents in the order presented in defendant's brief.

### The Law

" 'The law governing defendant's claim is settled. "A criminal defendant is guaranteed the right to the assistance of counsel by both the state and federal Constitutions. [Citations.] 'Construed in light of its purpose, the right entitles the defendant not to some bare assistance but rather to *effective* assistance.' " [Citations.] It is defendant's burden to demonstrate the inadequacy of trial counsel. [Citation.] We have summarized defendant's burden as follows: " 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " [Citation.] [¶] Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." [Citation.] Defendant's burden is difficult to carry on direct appeal, as we have observed: " 'Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission.' " [Citation.]' [Citation.] If the record on appeal ' " 'sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to

5

provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected," ' and the 'claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding.' [Citation.]" (*People v. Vines* (2011) 51 Cal.4th 830, 875–876.)

## First Failure to Object

The prosecutor's direct examination of Deputy Keener concluded as follows:

"Q. . . . And at some point did you make a determination about whether [the victim] and her sister were safe in their current situation?

"A. After initially speaking with [the victim], she kind of—she—I kind of got the feeling that, you know, obviously she was telling the truth, so I didn't feel that it was safe at that point for her to be with the dad. So I took possession of the kids and turned them over to CPS for safekeeping.

"Q. That was pursuant to Welfare and Institution Code Section 300 and so on?

"A. Correct."

The Deputy's opinion that the victim "was telling the truth" was improper, and should not have been heard by jury. (See *People v. Melton* (1988) 44 Cal.3d 713, 744 ["Lay opinion about the veracity of particular statements by another is inadmissible on that issue."].) But there is no suggestion that the prosecutor intentionally elicited it, or even anticipated it. Defendant's trial counsel certainly could have made an objection and moved to strike the offending opinion, but was the integrity of the trial compromised by his failure to do so? We conclude not.

The decision whether to object is very much a tactical decision of the type to which reviewing courts accord substantial deference. This is behind the numerous decisions by our Supreme Court establishing that a failure to object will "rarely" show reversible incompetence. (E.g., *People v. Harris* (2008) 43 Cal.4th 1269, 1290; *People v. Maury* (2003) 30 Cal.4th 342, 415–416; *People v. Kelly* (1992) 1 Cal.4th 495, 540.) Counsel could have concluded that to object to the improper comments would only draw undue attention to them. Alternatively—and this is what he did—counsel could have determined to use the deputy's opinion as the basis for opening questioning on the subject

of whether the victim's accusations appeared to be the product of coaching.  That decision was well within the range of trial strategy.  Even if it was determined to be indefensible, it was too fleeting an utterance to qualify as prejudicial.

### Second Failure to Object

The prosecutor asked defendant on cross-examination about the reason the family was moving to Utah:

"Q.  . . . [A]t the time that these allegations came to light on March 4th, you were planning to move back to Utah . . . ?

"A.  Yes.

"Q.  And you were planning to move back because you had been evicted from the residence where you were living?

"A.  No.

"MR. QUINN [defense counsel]:  Objection.  Relevance.

"THE COURT:  Overruled.

"BY MR. BORG [the prosecutor]:

"Q.  Now you weren't told to leave that—

"A.  We were told to leave but that's not why we were planning to move back to Utah.

"Q.  Okay.  And you were told to leave because you had basically trashed the inside of that trailer and ruined it?

"MR. QUINN:  Objection.  Relevance, improper character evidence.  The fact that somebody, you know, vandalized something doesn't mean they're a child molester, assuming that's even true.

"THE COURT:  Can counsel approach.

"(Bench conference off the record.)

"THE COURT:  Back on the record.  The objection's sustained.

"BY MR. BORG:

"Q.  All right.  Why did you move out of [the grandmother's] house?

"A.  She asked us to.

7

"Q. Did she tell you why?

"A. Yes.

"Q. Why?

"A. Because she felt that her husband wouldn't move back in with her if we were living with her."

Shortly thereafter, the following occurred:

"Q. . . . At some point you were asked to leave the trailer . . . you were living in?

"A. Yes. [¶] . . . [¶]

"Q. How long did it take you to get ready to move . . . ?

"A. Well, we were planning on moving back to Utah for a couple months actually, but we were asked to leave the trailer after that and that's when we disclosed that we were going back to Utah.

"Q. I'm sorry, I didn't hear?

"A. That's when we disclosed that we were going to move back to Utah.

"Q. Is when you were asked to leave?

"A. Yes.

"Q. And you don't remember when you were asked to leave?

"A. It was sometime after we decided to move already.

"Q. But you didn't tell anybody that, that you were planning to move?

"A. No. Well, not right away, no.

"Q. Why were you asked to move out of the trailer? [¶] . . . [¶]

"A. Why were we asked to move?

"Q. Yes.

"A. Due to some property damage.

"Q. What kind of property damage?

"A. I tore the bathroom door off.

"Q. Anything else?

"A. The cabinet door.

"Q. Why did you do that?

8

"A. Say again?

"Q. Why did you do that?

"A. Because I had made previous inquiries with the property owners to fix them because they were kind of hanging off a little bit and they did not [fix them]. And my daughter could not open the bathroom door because it was only on one hinge.

"Q. So instead of fixing it you tore it off?

"A. Well, I took it off, yes.

"Q. You said 'tore it off' earlier.

"A. Well, tore, yeah.

"Q. Yeah, you didn't have a screwdriver?

"A. No, didn't need one. It was barely on there."

Defendant argues trial counsel should have objected to this evidence of his "propensity for violence." But the record shows that defense counsel *did* successfully object to evidence that defendant "trashed the . . . trailer" was "improper character evidence." Nevertheless, when the prosecutor returned to the subject, counsel did not renew that objection. But a sound tactical reason for silence is immediately comprehensible in light of what counsel did thereafter: instead of having defendant seen as a violent domestic maniac, he was depicted as the concerned parent driven to self-help by his landlord's neglect. Counsel could make a reasonable tactical risk that he could turn a negative into a positive.

**The Failure to Object to the MDIC Interview Tapes**

Defendant's final point is that his trial counsel should have tried to exclude evidence of Hinchcliff's interviews with the victim at the MDIC. That is, counsel should have moved under Evidence Code section 1360 to prevent the jury from seeing the tapes of the recorded interviews. And defendant asks this court to review the tapes, "confident that viewing them will leave no possible doubt that their admission was prejudicial."

That is not our function in assessing a claim of ineffective assistance of trial counsel. As already noted, the inquiry on direct appeal is not broad. Because trial counsel did not provide his reasoning for this decision, we can reverse only if there could

9

be no rational tactical purpose. (*People v. Vines*, *supra*, 51 Cal.4th 830, 876.) Two come quickly to mind.

First, trial counsel might simply disagree with defendant's appointed appellate counsel as to whether a valid ground for exclusion did exist. We do not have the actual recordings of the MDIC sessions with Hinchcliff, but we do have transcripts of the sessions. A reading of those transcripts does not establish the statements were excludable as a matter of law.

Second, counsel could have decided—and apparently did decide—that the most promising approach would be one a jury could immediately grasp: the child was coached into making a baseless accusation that was accepted because of the faulty methodology of an unthinking bureaucracy. The fact that the first interview produced nothing can be seen as supportive of this belief, particularly when contrasted with the second. As the Attorney General puts it in her brief: "counsel's statements in closing argument demonstrate that juxtaposing [the victim's] reluctance in the first interview with her eagerness to disclose abuse in the second interview was at the core of his theory that [the victim] was coached to make allegations against her father at some point between the two interviews." Counsel might also have concluded that showing the jury the extrinsic circumstances could also impeach the second interview if the jury was acquainted with the grandmother's animus towards defendant. It is also noteworthy that counsel felt sufficiently comfortable with the tapes to play them to the jury to illustrate points he was making in closing argument.

"When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect. [¶] . . . [¶] The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." (*Yarborough v. Gentry* (2003) 540 U.S. 1, 8.)

## DISPOSITION

The judgment of conviction is affirmed.

10

_____
Richman, J.

We concur:


_____
Kline, P.J.


_____
Stewart, J.


A143871; *P. v. Williams*

11