Filed 6/14/16  P. v. Vivo CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JONATHON CHRISTOPHER VIVO,<br><br>    Defendant and Appellant. | B259912<br><br>(Los Angeles County<br>Super. Ct. No. BA414486) |

        APPEAL from a judgment of the Superior Court of Los Angeles County. David V. Herriford, Judge.  Affirmed as modified.

        Heather J. Manolakas, under appointment by the Court of Appeal, for Defendant and Appellant.

        Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Russell A. Lehman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In an information filed by the Los Angeles County District Attorney, defendant and appellant Jonathon Christopher Vivo was charged with shooting at an inhabited dwelling (Pen. Code, § 246, counts 1 & 2),[1] discharge of a firearm with gross negligence (§ 246.3, subd. (a), count 3), possession of an assault weapon (§ 30605, subd. (a), count 4), possession of a short-barreled shotgun (§ 33215, count 5), possession of a controlled substance while armed with a firearm (Health & Saf. Code, § 11370.1, subd. (a), count 6), and possession of sale of a controlled substance (Health & Saf. Code, § 11351, count 7).

Appellant pleaded not guilty. Trial was by jury. The jury found appellant guilty on all seven counts.

Probation was denied and appellant was sentenced to state prison for an aggregate term of seven years four months, computed as follows: five years (the middle term) on count 1; and consecutive subordinate terms of eight months on count 4, eight months on count 5, and one year on count 6. Concurrent terms were imposed on counts 2 and 7. Sentencing on count 3 as stayed pursuant to section 654.

Appellant timely filed a notice of appeal. On appeal, he argues that the trial court committed prejudicial error by failing to exclude evidence of his prior arrest. He also argues that the trial court committed prejudicial error by failing to instruct the jury sua sponte pursuant to CALCRIM No. 224. Finally, he asks that we order the trial court to correct the abstract of judgment to reflect his sentence of seven years four months.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

**FACTUAL BACKGROUND**

I. *Prosecution Evidence*

    A. <u>This Incident</u>

The Bunker Hill Apartments (BHA) complex in Los Angeles is adjacent to the Orsini Apartments complex (the Orsini). Only a walkway separates the buildings.

On April 27, 2013, Ashley Rossetto (Rossetto) went out to the Greystone Club in West Hollywood with her boyfriend, appellant, and some of his friends. After staying at the bar for a couple of hours, appellant and Rossetto got into a heated argument and were asked to leave. At around 2:00 a.m. on April 28, 2013, Rossetto, appellant, and appellant's friend Igor left the bar together, went to a 7-Eleven store, and then went back to appellant's two-bedroom apartment in the Orsini. The heated argument between appellant and Rossetto continued on the ride back to appellant's apartment. Rossetto was intoxicated.

At appellant's apartment, appellant and Rossetto continued to fight. Barefoot, Rossetto ran out of the apartment through a sliding glass door to a backyard patio, jumped over a short wall, climbed over a chain-link fence behind the Orsini, and then walked out on the street. She left her shoes and keys in appellant's apartment. Rossetto was upset, mad, and crying. After she jumped over the short wall, but before she climbed over the chain-link fence, Rossetto heard gunshots.

Rocio Herron (Herron) lived in a second-floor apartment in the BHA. At around 3:00 a.m., Herron was lying on her bed, having been awakened when she heard her neighbor's dog barking in a downstairs apartment. Moments later, she heard a gunshot. Herron got up and looked out her window. She saw six or seven muzzle flashes being fired from the patio of appellant's apartment about 20 feet away and heard the corresponding gunshots. She gathered her two young children, who were sleeping, and hid with them in her son's bedroom.

Arcelia Kennedy (Kennedy) lived in the apartment directly below Herron's apartment. In the early morning hours, while Kennedy was watching movies with her

3

three children, they heard gunshots.  Kennedy and her children dove to the floor.  After hearing the gunshots, Kennedy smelled burnt gun powder.

Meanwhile, as Rossetto walked barefoot on the street, she saw police officers and talked to them.

Los Angeles Police Sergeant Tim Jones drove to the Orsini in response to multiple 9-1-1 calls concerning shots fired.  Sergeant Jones saw Rossetto, who was crouching, crying and shaking, and appeared to be scared.  Sergeant Jones approached Rossetto to determine what was going on.  Rossetto was not wearing shoes, her hair was a mess, and she was barely dressed.  She smelled of alcohol.  He asked her if she was okay and she replied, "'No.'"  She was afraid that her boyfriend was going to kill her.  She refused to tell Sergeant Jones her boyfriend's name or location.  As Sergeant Jones was talking with Rossetto, Los Angeles Police Officer Manuel Sanchez arrived.

Rossetto told Officer Sanchez the following:  She and appellant left a club in West Hollywood after having been kicked out.  They arrived back at his apartment at around 2:30 a.m.  Appellant passed out for about 10 minutes.  When he awoke, Rossetto said that she needed to go home and asked appellant to drive her there.  He called Rossetto a "'dumb bitch,'" and then grabbed a picture from a wall and threw it at her, striking her on the shoulder and finger.  He then knocked over a coffee table in the living room.  Rossetto ran out to the rear patio area and appellant ran into his bedroom.  Rossetto hid behind a neighbor's patio.  She heard a gunshot and saw a palm frond fall to the ground.  Rossetto saw the door to the patio at appellant's apartment close for about 30 seconds and then reopen.  She next saw and heard appellant fire three gunshots from a rifle.  Appellant went back inside his apartment.  Rossetto saw someone on a balcony on the upper floor and asked him to call the police.  Scared, Rossetto climbed over a chain-link fence and walked to the front of the Orsini, where she met Sergeant Jones.

Los Angeles Police Officer Christopher Doan and his partner, Los Angeles Police Officer Archuleta, also went to the Orsini in response to multiple 9-1-1 calls.  The calls indicated that the gunshots came either from apartment 328 or appellant's apartment, apartment 326.  Upon their arrival, Officers Doan and Archuleta went directly to

4

apartments 326 and 328, which are adjacent to each other. Officers Kim and Vasquez joined them. The officers arrived at apartment 328 first and knocked on the door; no one answered. They then knocked on apartment 326 and received no answer. When they again knocked on the door of apartment 328, about five minutes after the shots fired were reported to 9-1-1, Omar Jacques (Jacques) answered the door. Officer Doan told Jacques that the officers were there in response to a call concerning shots fired from either his apartment or the one next door. Jacques confirmed that he had a gun in his apartment and gave the officers permission to retrieve it. The gun, a Springfield 40-caliber semiautomatic handgun with 11 rounds loaded into its 12-round capacity magazine, was in a kitchen drawer next to the stove. Officer Doan retrieved the gun and it was warm. He did not see any spent shell casings in Jacques's apartment.

Officer Doan escorted Rossetto upstairs so she could retrieve her shoes and purse from appellant's apartment. She confirmed that that was the apartment she was referring to in explaining what had happened. The officers opened the door, which was unlocked, and looked into appellant's apartment. Officer Doan saw a rifle and cocaine. The apartment had been "turned upside down." The sliding glass door to the patio was open. The officers conducted a protective sweep of the apartment, which confirmed that no one was there. The officers guarded the apartment while a search warrant was obtained.

Appellant's black Audi was parked in the space assigned to his apartment in the underground parking beneath the apartment building.

When Herron reentered her bedroom at around 8:30 a.m., she noticed two bullet holes in her window, with corresponding bullet holes in her closet door and closet wall, and fragments of her window blinds on the floor. Herron called the police, who arrived about 30 minutes later. She told the police what she had perceived and showed them the damage. The police photographed Herron's apartment. Los Angeles Police Officer Rodney Hernandez recovered a fired bullet fragment from Herron's apartment.

Officers returned to appellant's apartment and executed a search warrant at around 3:30 p.m. On the floor, by the threshold of the sliding glass door to the patio, were a

5

spent shell casing and two live rounds of ammunition. Another spent shell casing was under a chair on the patio.

Leaning against a futon or sofa in the bedroom where appellant slept was an SKS semiautomatic assault rifle, loaded with six rounds in its 10-round capacity magazine and another round in the chamber. A number of spent shell casings were on the floor of appellant's bedroom closet, five spent .357 shell casings were on the bed, and a spent shotgun shell casing was in the bedroom.

Leaning against appellant's bed were a 12-gauge shotgun and a sawed-off 12-gauge shotgun. The barrel and stock of the sawed-off shotgun had been crudely sawn off, such that the barrel was less than 13 and one-half inches long and the overall length of the firearm was less than 26 inches long. Resting on top of the frame of a picture hanging in the master bedroom were rounds of live ammunition. On top of the dresser was a money counting machine, which contained $2,040 in cash.

In a cabinet under the sink in the master bathroom was a coffee bean grinder containing 17.19 grams of a white powder substance that resembled, but was not, cocaine.[2] On a counter was a live round of SKS ammunition.

On the kitchen counter was a digital scale with white powder residue on it.

A loaded Smith & Wesson .357 revolver hand gun was on the floor of the living room and a spent .357 shell casing was located by some couches. Also in the living room was a metal push cart, which had two digital scales and a wooden box on the top shelf. The wooden box contained bags of at least 100 empty glass vials and a sandwich bag containing 12.17 grams of an unknown white powder substance that resembled, but was not, cocaine. On the lower shelf of the metal push cart were 14 clear glass vials filled with an off-white powder resembling cocaine, each of which was capped with a black stopper. The contents of four of those vials were analyzed and found to contain cocaine, with a total net weight of 7.47 grams.

---

[2] Cutting agents are often used by cocaine dealers to increase the volume of sellable cocaine and maximize profit. Users of cocaine would not generally cut their cocaine with a cutting agent.

Los Angeles Police Detective Jorge Trejo testified as a narcotics expert. Given a hypothetical based on the evidence found in appellant's apartment, Detective Trejo opined that the 14 vials containing cocaine were possessed for sale.

A woman's purse on the floor of appellant's living room contained a smaller clutch, which held Rossetto's identification, a vial matching those on the metal push cart, and five small red baggies of powder cocaine.

In addition to the master bedroom in which appellant slept, there was another bedroom with no bed or any other indication that anyone lived or slept there. There was no indication that anyone other than appellant lived in the apartment.

When Kennedy returned home from work later that day, she noticed a bullet hole in the mattress of her son's bed. She called the police. Los Angeles Police Officer Gabriel Lobato and his partner, Officer Pool, responded to the call. Kennedy showed the officers the bullet hole. Officer Pool recovered a bullet fragment from under the bed.

Criminalist Karole Acosta testified as a firearms expert regarding the weapons and shell casings recovered.

Several months after the incident, Rossetto wrote a letter and delivered it to appellant's attorney. She said that she was not afraid of appellant but was initially afraid that her relationship with him might end. She was crying because she was upset about her fight with appellant. She testified at trial that she had never seen appellant hold or shoot a gun and had never seen a firearm, ammunition, or narcotics in his apartment. When she testified at trial, she was still appellant's girlfriend. She did not want him to go to prison.

B. Evidence Regarding a Prior Incident on June 2, 2012

At around 11:40 p.m. on June 2, 2012, as Los Angeles County Deputy Sheriff Todd Mohr was on patrol in West Hollywood, he noticed a black Audi parked at a curb in front of a fire hydrant. As Deputy Mohr pulled up behind the Audi, a man and woman exited the car and walked away. Deputy Mohr exited his vehicle and walked up to the driver's window of the Audi. As he stood at the driver's window, Deputy Mohr saw appellant, who was seated in the driver's seat. He had a checkered bag in his lap between

7

his legs. In the bag were Ziploc bags, which in turn contained glass vials with black lids. Appellant appeared to be putting money into the larger bag. After several seconds passed, appellant seemed to notice Deputy Mohr at the window. Appellant rolled down the window and asked Deputy Mohr if he was going to be in custody for drugs. Deputy Mohr asked appellant to step out of the car. Deputy Mohr opened the checkered bag and inventoried its contents. The Ziploc bags contained 82 vials, one of which contained 0.49 grams and another which contained 0.50 grams of cocaine. The checkered bag also contained two smaller pink Ziploc baggies containing a powder substance resembling cocaine, which had a gross weight of 0.88 grams.

II. *Defense Evidence*

Appellant's friend, Cesar Valdizan (Valdizan), saw appellant at the Greystone Manor nightclub on the night of April 27, 2013. Appellant had a cast on one of his forearms. Appellant left the nightclub at Valdizan's request because he was intoxicated.

Apparently about two weeks earlier, appellant had to go to a hospital for stitches because he had a piece of glass in one of his arms, which was bleeding. After appellant received stitches, his arm was wrapped in bandages.

Grace Wang (Wang) lived in apartment 330 at the Orsini. At around 3:30 a.m. on April 28, 2013, while Wang was in the living room of her apartment, she heard about five to eight gunshots. Wang believed that the gunshots came either from the apartment next to hers (apartment 328) or from a neighboring building. She told a responding police officer that she believed that the source of the gunshots was from apartment 328.

III. *Closing Arguments*

As is relevant to the issues in this appeal, during closing argument appellant's counsel asserted that multiple people had access to apartment 326 (appellant's apartment) and that others may have placed the contraband in that apartment.

**DISCUSSION**

I. *Admission of Evidence*

Appellant contends that the trial court committed prejudicial error by admitting evidence of the uncharged 2012 incident pursuant to Evidence Code sections 1101, subdivision (b), and 352.

A. Relevant Factual Proceedings

Prior to trial, appellant asked the trial court to exclude evidence related to appellant's prior arrest for possession for sale of cocaine, which the prosecution sought to present pursuant to Evidence Code section 1101, subdivision (b). Appellant argued that such evidence would constitute improper character evidence and should be excluded under Evidence Code section 352. The prosecutor sought admission of the evidence to show appellant's intent to sell the cocaine found in his apartment and his identity. He argued that the facts of the prior uncharged incident were highly probative on an intent to sell cocaine and of appellant's identity in that in both the charged and uncharged incidents, the cocaine was packaged in the same distinct clear vials with the same distinctive black caps on them containing the same quantity of cocaine. Furthermore, the evidence of the prior uncharged incident helped show appellant's identity in that the same car that appellant was in at the time of the uncharged incident was parked in the numbered parking spot corresponding to the apartment in which the firearms, cocaine, and associated paraphernalia were found concerning the charged offenses.

Appellant replied that the evidence should be excluded as improper character evidence under Evidence Code section 1101, subdivision (a), and that the prosecution could establish intent to sell the cocaine with other less prejudicial evidence.

After taking the matter under submission, the trial court determined that the evidence was admissible. It found that the evidence was probably more probative on the issue of identity as opposed to intent, because the prosecution has "fairly significant evidence" of the latter, but that the evidence was material. Moreover, the evidence was not overly prejudicial or inflammatory. In fact, the evidence of the prior uncharged offense "pale[d] in comparison" to the evidence in this charged incident.

9

The prosecution then presented evidence of the 2012 incident. And, the trial court gave the following limiting instruction (CALCRIM No. 375): "The People presented evidence that the defendant committed another offense that was not charged in this case. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the offense. Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the [uncharged] offense, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not: [¶] The defendant was the person who committed the offense alleged in Count 7 in this case, or in the lesser included offense to Count 7; or [¶] The defendant acted with the intent to sell cocaine in this case. [¶] In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offense and the charged offense. [¶] Do not consider this evidence for any other purpose. [¶] Do not conclude from this evidence that the defendant has a bad character or is predisposed to commit crime. [¶] If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of Count 7 or the lesser included offense to Count 7. The People must still prove every charge beyond a reasonable doubt."

B. <u>Relevant Law</u>

Evidence Code section 1101, subdivision (b), provides, in relevant part: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, . . .) other than his or her disposition to commit such an act." Pursuant to this statute, a trial court has discretion to admit evidence of a defendant's conduct other than the conduct for which he is charged if that evidence is relevant to prove some fact at issue and if the probative

10

value of the evidence is not substantially outweighed by the probability that its admission will create a substantial danger of undue prejudice. (*People v. Hawkins* (1995) 10 Cal.4th 920, 951.)

We review the trial court's admission of such evidence of abuse of discretion. (*People v. Foster* (2010) 50 Cal.4th 1301, 1328–1329.)

C. <u>Analysis</u>

Applying the foregoing principles, we conclude that the trial court did not abuse its discretion in admitting the evidence of the 2012 uncharged incident involving appellant. First, evidence of the uncharged offense was probative of appellant's identity. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403.) Appellant's identity as the person who possessed the contraband was highly material and in contention—Rossetto testified that she had never seen any narcotics in appellant's apartment, and the defense argued that others may have had control and dominion over the apartment, including persons who could have placed items in the apartment. Evidence of the June 2012 incident showed that appellant owned a black Audi and was in possession of cocaine for sale.

The evidence of the uncharged incident was also probative of appellant's intent. (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 402.) Again, evidence of the June 2012 incident was sufficiently similar to the charged incident to show that appellant harbored the same intent in each instance—to sell the cocaine he possessed.

Even if the trial court had erred in admitting this evidence (which we conclude it did not), any error would have been harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) As noted above, the trial court gave the jury an appropriate limiting instruction. (*People v. Lewis* (2001) 25 Cal.4th 610, 637.) And, as the trial court noted, the evidence of the charged crimes was far more inflammatory than the evidence of the uncharged 2012 incident. The evidence of the charged offenses was overwhelming—multiple police officers entered appellant's apartment minutes after the gunshots were fired; the officers located a grinder containing a cutting agent that resembled cocaine, numerous digital scales, bags with at least 100 empty glass vials, 14 glass vials containing cocaine, and a money counting machine that contained $2,040 in cash; given a hypothetical based on the

11

evidence found at appellant's apartment, Detective Trejo opined that the 14 vials containing cocaine were possessed for sale. In light of this evidence, we conclude that the jury would have reached a guilty verdict even absent the evidence of the uncharged prior incident. It follows that any error in admitting the challenged evidence was harmless.

II. *Alleged Instructional Error*

The jury was instructed on how to consider circumstantial evidence in accordance with CALCRIM Nos. 223 (Direct and Circumstantial Evidence: Defined), 225 (Circumstantial Evidence: Intent or Mental State), and 375 (Evidence of Uncharged Offense to Prove Identity, Intent, Common Plan, etc.). Appellant argues that the trial court erred in failing to instruct the jury sua sponte pursuant to CALCRIM No. 224.[3]

Trial courts have a duty to instruct on the "'"'general principles of law relevant to the issue raised by the evidence. [Citations.]"'"'" (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) "CALCRIM No. 224 states such a principle that must be given sua sponte on those occasions when it is applicable. [Citations.] It is applicable only when the prosecution substantially relies on circumstantial evidence to establish any element of the case. [Citations.] The instruction should not be given where circumstantial evidence is incidental to and corroborative of direct evidence. [Citations.]" (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1171, fn. omitted.) We review claims of instructional error de novo. (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.)

Here, the prosecution relied upon direct evidence to prove its case, namely evidence of Rossetto's statements to Officer Sanchez, testimony by law enforcement, other witness testimony, and physical evidence including photographs, collected bullet fragments, and items of contraband found in appellant's apartment. Because the only element of the charged offenses that rested substantially or entirely upon circumstantial

---

[3]    The People argue that appellant forfeited this objection on appeal by failing to object below. Because appellant's theory is that the trial court had the duty to instruct the jury sua sponte, his argument is not forfeited on appeal. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1075, fn. 3.)

evidence was appellant's intent or mental state, the trial court properly instructed the jury with CALCRIM No. 225, not CALCRIM No. 224.

Appellant asserts that the failure to instruct pursuant to CALCRIM No. 224 "created an irreconcilable conflict between the prosecution's burden of proof and the burden of proof set forth in [CALCRIM] No. 375." We disagree.

When considering a claim that a jury instruction was ambiguous, "we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction." (*People v. Smithey* (1999) 20 Cal.4th 936, 963.) In so doing, we determine the correctness of the jury instructions "'"from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction."'" (*People v. Smithey*, *supra*, at p. 987.) In other words, we view the instructions in the context of the overall charge. (*People v. Mayfield* (1997) 14 Cal.4th 668, 777, overruled on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2.) Moreover, a potential ambiguity in the instructions does not require reversal if the prosecution's argument correctly explained the relevant law. (*People v. Kelly* (1992) 1 Cal.4th 495, 526.)

Here, there is no reasonable likelihood that the jurors misapplied or misconstrued the instructions as given. The jury was instructed with CALCRIM No. 220 that appellant was presumed innocent, that the prosecution was required to prove his guilt beyond a reasonable doubt, and that unless the evidence proved his guilt beyond a reasonable doubt, he was entitled to an acquittal. The jury was also told, pursuant to CALCRIM No. 375, how to evaluate and use the evidence of the prior uncharged offense. In his closing argument, the prosecutor reiterated and emphasized that the People's burden of proof was to prove each element beyond a reasonable doubt. Under these circumstances, we readily conclude that the jury properly followed and applied the law.

Even if the trial court had erred by not instructing with CALCRIM No. 224 (which it did not), that error was harmless. (*People v. Rogers* (2006) 39 Cal.4th 826, 886 [no reasonable probability that had the jury been given a different instruction, it would have found the defendant not guilty]; *People v. Flood* (1998) 18 Cal.4th 470, 504 ["whether it appears beyond a reasonable doubt that the error did not contribute to this jury's

verdict"].) As set forth above, the trial court gave ample instructions regarding the prosecution's burden of proof, and the evidence of appellant's guilt was overwhelming. As argued by the prosecutor, the only reasonable conclusion supported by the evidence was that appellant was guilty of all of the charged offenses.

III. *Correction of Abstract of Judgment*

The trial court sentenced appellant to state prison for an aggregate term of seven years four months. On count 3, the trial court selected the middle term of two years, but stayed that sentence pursuant to section 654. While the abstract of judgment accurately indicates that the middle term was stayed, it mistakenly includes the two years in the total time imposed and lists the total time as nine years four months.

Appellant asks that this Court order the abstract of judgment corrected and the People agree. We order the trial court to correct the abstract of judgment to reflect the sentence imposed, namely seven years four months. (*People v. Mitchell* (2001) 26 Cal.4th 181, 183, 185–188.)

**DISPOSITION**

The judgment is affirmed as modified. The abstract of judgment shall be corrected to reflect appellant's sentence of seven years four months.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
                ASHMANN-GERST

We concur:


_____, J.
          CHAVEZ


_____, J.
          HOFFSTADT

14